THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS J. MACKELL, JAMES D. ROBERTSON AND FRANK R. DI PAOLA, Appellants.

Second Department, March 28, 1975

*Charles S. Desmond* and *McGuire & Lawler* for Thomas J. Mackell, appellant.

*Joseph W. Bellacosa* for James D. Robertson, appellant.

*Sturim & Nizin (Allan Sturim* of counsel), for Frank R. Di Paola, appellant.

*Maurice H. Nadjari, Deputy Attorney-General, Special State Prosecutor (Bennett L. Gershman, Allen G. Swan, Barry M. Fallick* and *Louis A. Perez, Jr.,* of counsel), for respondent.

*Per Curiam.* The defendants appeal from judgments of the Extraordinary Special and Trial Term of the Supreme Court, Queens County, rendered April 22, 1974, convicting them of conspiracy in the fourth degree (two counts), hindering prosecution in the third degree (two counts) and official misconduct (two counts), upon a jury verdict, and sentencing each of them to a term of six months upon each count of hindering prosecution, a term of six months upon each count of official misconduct and a term of three months upon each count of conspiracy, all the sentences to run concurrently. We reverse the judgments, on the law and the facts, and dismiss the indictment.

In the early 1960s, Joseph Ferdinando, a resident of Queens County and meter reader for Consolidated Edison Company, entered upon a scheme under which he accepted money from various investors, agreeing to pay them a return of 1% a week and explaining to them that this high return was being paid by a factoring company which loaned out moneys to various companies in the fur, textile and other industries where there was a need for immediate cash. In fact, there was no factoring company and Ferdinando was merely repaying these people from their own moneys. Among the hundreds of persons who invested with Ferdinando were members of the staff of the District Attorney of Queens County, including defendants Di Paola and Robertson. (Although a considerable amount of suggestive hearsay testimony was introduced at the trial, it was never established that defendant Mackell was an investor.)

In March of 1971, after being the victim of a real or apparent robbery, and being ostensibly unable to continue to pay off investors, Ferdinando fled New York City and went to San Francisco. His whereabouts were unknown to the authorities until a year later, when he was discovered by two irate investors and was returned to New York City by them. Within two weeks, he was indicted for 35 counts of grand larceny by a Queens County Grand Jury upon presentation of the case by the District Attorney's office. At that time, defendant Mackell was the District Attorney of Queens County, Robertson, his son-in-law, was the Deputy Chief Assistant District Attorney, and Di Paola was a County Detective in the District Attorney's office.

Despite the fact that Ferdinando was indicted after his apprehension, convicted upon his plea of guilty to three counts of the 35-count indictment and sentenced to a conditional

discharge, the Special Prosecutor secured a 10-count indictment against the defendants herein by the Extraordinary Special Grand Jury of the County of Queens based upon allegations that they had been trying to cover up knowledge of Ferdinando's scheme. The 10 counts were eventually reduced to six. Of those remaining, two were the above-mentioned hindering of prosecution. One of these was based on allegations that the defendants had misled the Bronx District Attorney's office and thereby prevented that office from investigating the matter and referring it to a law enforcement agency other than the Queens District Attorney's office. The other of these hindering prosecution counts was based on allegations that the defendants had falsely advised two investors in the scheme that the matter of Ferdinando's disappearance was already under investigation, thereby preventing the police from learning about and investigating the Ferdinando scheme.

Two other remaining counts were official misconduct. One was based on allegations that the defendants had failed to conduct an investigation of persons in the Queens District Attorney's office who were involved in the Ferdinando scheme. The other alleged the defendants' failure to disclose their knowledge to the Bronx District Attorney's office, which was conducting an investigation of the Ferdinando scheme.

These crimes of hindering prosecution and official misconduct each formed the basis for one of the two above-mentioned conspiracy counts, which were also among the six remaining counts. The conspiracy counts alleged the following overt acts: (1) on March 16, 1971, immediately after the robbery of Ferdinando, defendant Di Paola, a large investor who had introduced several members of the Queens District Attorney's office to the investment plan, told another investor to keep quiet about the Ferdinando matter; (2) the next day, Di Paola told the same man that his office was investigating the matter and told Ferdinando's wife not to discuss the matter with anybody or do anything, but to leave it in the hands of the District Attorney; (3) in August of 1971 defendant Mackell concealed his knowledge of the Ferdinando scheme from Burton Roberts, the then District Attorney of Bronx County, and assigned defendant Robertson to investigate the Ferdinando matter, even though he knew Robertson was an investor; (4) on August 20, 1971 Robertson falsely told Bronx Assistant District Attorney Bornstein that he did not know whether there was a "Frank" [Di Paola's first name] in the Queens

District Attorney's office and then, on August 30, 1971, he categorically told Bornstein that there was no Frank in that office; (5) on March 13, 1972 Mackell told Chief Assistant District Attorney Ludwig to prosecute only Ferdinando; and (6) in March of 1972 Mackell told Ludwig not to question Di Paola as a prospective defendant and accomplice of Ferdinando. Although there was sufficient evidence for the jury to find that all of these overt acts had occurred, these acts were not in furtherance of a conspiracy and did not constitute the substantive crimes of hindering prosecution or of official misconduct.

Before a conspiracy can be shown to have existed, there must be proof of an agreement, express or implied, with a common corrupt intent in the minds of at least two or more persons *(People v Chaplin,* 8 AD2d 286). Neither the agreement nor the criminal intent need be proved by direct evidence. They both may be proved inferentially *(People v Flack,* 125 NY 324; *People v Silverman,* 252 App Div 149). In this case, the only evidence of conspiracy was circumstantial. Therefore, the facts proven must exclude to a moral certainty every hypothesis except that of the crime charged and they must be inconsistent with innocence *(People v Weiss,* 290 NY 160, 163).

In this case, the evidence against the defendants was insufficient because it was consistent with innocence and would be consistent with a finding that there was no agreement among the actors. The individual, independent acts of these defendants may reasonably be considered to have been valid exercises of the discretion which inheres in a prosecutor's office. Indeed, there is no evidence of facts extant prior to Ferdinando's disappearance from which any inference of an agreement may be drawn. The defendants' activities subsequent thereto do not logically lead to the conclusion that there was an agreement among them, let alone an agreement fraught with criminal intent.

For example, Di Paola's statements just after Ferdinando's disappearance suggest a spontaneity belying any intention that the statements were in furtherance of an agreement. In fact, the evidence is insufficient to show that at the time Di Paola made the statements, or at any time thereafter, he thought that the Queens District Attorney's office would not investigate the disappearance.

The subsequent action or inaction by Mackell would be

consistent with a finding that it was the result of a personal decision as to how to proceed with the investigation and prosecution of Ferdinando. It requires a tortured logic unsupported by the facts to find that Mackell was proceeding in furtherance of a conspiracy.

As a further example, Robertson's lies to Bornstein, perhaps the only unequivocal acts in the entire scenario, do not alone establish the existence of an agreement. These lies were no doubt occasioned by Robertson's embarrassment at being involved with Ferdinando, but there is insufficient evidence to justify a finding that the lies were in furtherance of any agreement.

Moreover, we cannot fail to note the fact that Ferdinando moved this court for a change of venue because of his fear of overzealous prosecution, and his motion was granted. Although not determinative, this does suggest the weakness of the People's case with respect to the existence of a conspiracy designed to prevent Ferdinando's prosecution.

Even if the existence of an agreement had been proved, evidence of the second element of the crime of conspiracy, i.e., criminal intent, was clearly lacking, as is shown by analysis of the individual counts of the indictment charging the substantive crimes.

With respect to the first count of hindering prosecution, it is clear that Di Paola had nothing to do with misleading the Bronx District Attorney's office, since he had no communications with that office. There can be no doubt that the jury's verdict as to Di Paola on this count is unsupported by the evidence, since there was no proof of conspiracy.

As to defendants Mackell and Robertson, the situation is more complicated. When Bronx District Attorney Roberts received notification that a Bronx resident had complained about Ferdinando's scheme and that she had heard that the Queens District Attorney would do nothing about it because of his own involvement, Roberts called up Mackell and related this story. According to Roberts' uncontroverted testimony, he had determined in his own mind, prior to calling Mackell, to refer the matter to the Queens District Attorney. Mackell's failure to mention his knowledge of the Ferdinando matter had nothing to do with Roberts' referral of the matter to Mackell's office. Furthermore, Roberts and his staff continued to remain in the investigation, keeping tabs on the progress being made by Mackell's office. There is nothing in the record

which shows that the failure of Mackell to disclose his knowledge of the situation hindered any action the Bronx District Attorney may have contemplated. Although Roberts did testify that he had considered referring the matter to the State Investigations Commission, he once again categorically stated that he had abandoned this idea before speaking to Mackell. Furthermore, the State Investigations Commission has no authority to prosecute crimes or to lodge criminal complaints. Any referral of the matter to that body would have related to the activities of the public officials. It would not and could not have any bearing on whether Ferdinando was apprehended and prosecuted.

The evidence clearly establishes that Robertson lied to Bornstein with respect to the existence of a "Frank" in the Queens District Attorney's office. In fact, Robertson subsequently apologized for misleading Bornstein. However, as with Mackell's silence, there is nothing in the record to suggest that this falsehood had anything to do with hindering the prosecution of Ferdinando. The Bronx office had come up with the name "Frank" as relating to the person in the Queens District Attorney's office who was involved with Ferdinando. Bornstein gave this information to Robertson so that Robertson could check out whether there was any such involvement. Since Robertson, having been introduced to Ferdinando by Di Paola, was well aware of this connection, there was nothing for him to check out. Any suggestion that the Bronx office would have been able to do anything about arresting or prosecuting Ferdinando had Robertson reported Di Paola's existence and connection with the Queens office is purely speculative and unsupported by anything in the record.

As the first count of hindering prosecution had nothing to do with Di Paola, the second count of hindering prosecution has nothing to do with Mackell and Robertson. This count alleged that the defendants falsely advised two investors, Brian Quinn and Eugene Lavin, that the matter of the Ferdinando robbery was already under investigation by the Queens District Attorney's office. However, the record clearly shows that the only person who ever spoke to Quinn and Lavin was Di Paola and that neither Mackell nor Robertson ever spoke to them. There is nothing in the record to indicate that Di Paola spoke to either Mackell or Robertson prior to speaking to Quinn and Lavin. In fact, at the time Di Paola was alleged to have spoken to Quinn and Lavin, Mackell was at a District

Attorney's convention in Hawaii. Since there is not a shred of evidence to connect Mackell and Robertson to the facts alleged in this count of the indictment, the jury's verdict with respect to them was clearly erroneous.

Indeed, even with respect to Di Paola, the evidence does not support a conviction for hindering prosecution. The crime of hindering prosecution in the third degree is committed when a person "renders criminal assistance to a person who has committed a felony" (Penal Law, § 205.55). As far as applicable to the charges here, "a person 'renders criminal assistance' when, with intent to prevent, hinder or delay the discovery or apprehension of, or the lodging of a criminal charge against, a person who he knows or believes has committed a crime or is being sought by law enforcement officials for the commission of a crime * * * he * * * 4. Prevents or obstructs, by means of force, intimidation or deception, anyone from performing an act which might aid in the discovery or apprehension of such person or in the lodging of a criminal charge against him" (Penal Law, § 205.50). Nothing in the evidence gave rise to any inference that Di Paola had the intention to prevent, hinder or delay the discovery or apprehension of Ferdinando. Theoretically, Di Paola was one of the law enforcement officials who was seeking Ferdinando. Di Paola's suggestion that participants remain quiet about Ferdinando's disappearance appears to have been designed to avoid the obvious embarrassment of public disclosure. There is nothing to indicate that Di Paola's statement was designed to enable Ferdinando to escape the law.

Furthermore, in the absence of direct evidence to the contrary, neither Quinn nor Lavin was prevented by Di Paola's statement from going to any other authority. Quinn admitted at the trial that he had skimmed from money he picked up for others. Lavin had allowed his bar establishment to become the headquarters for Ferdinando's operations. Thus, it is obvious that Quinn's own criminal involvement and Lavin's fear of jeopardizing his liquor license were perforce a greater deterrent than was Di Paola's remark.

The two counts charging official misconduct present somewhat different problems. The pertinent portion of the applicable statute (Penal Law, § 195.00) states that official misconduct occurs when a public official "with intent to obtain a benefit * * * 2. * * * knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in

the nature of his office." The genesis of this statute lies in the various public officer misdemeanor provisions in the former Penal Law, which spoke of duties "enjoined by law" (viz., see former Penal Law, § 1857). The language "enjoined by law" was interpreted as applying only to duties enjoined by *statute* (*People v Ryall,* 58 Hun 235; *Hall v People,* 90 NY 498; *People v Kane,* 161 NY 380; *Brinckerhoff v Bostwick,* 99 NY 185; *People v Knapp,* 206 NY 373). Even a willful neglect or omission of a duty enjoined by the rules and regulations of a public department did not constitute any of the various crimes now simply labeled "official misconduct" *(People v McCann,* 151 Misc 792). Rather, such neglect or omission could constitute a crime only if the Legislature specifically enacted a provision making the rules promulgated pursuant to an act the equivalent of the law (i.e., statute) in force and effect. It has been suggested that the addition of the concept of a duty "clearly inherent in the nature of his office" (Penal Law, § 195.00, subd 2) was meant to cover the situation where a specific duty was subsumed in the over-all nondiscretionary function of the office but which was not spelled out in any statute (Marks and Paperno, Criminal Law in New York, § 446). We reject this narrow interpretation of the statute and, in accordance with the statutory mandate with respect to interpretation (Penal Law, § 5.00), hold that the crime of official misconduct may occur even where the public official's duty is couched with discretion. There can be no doubt that, had the Legislature intended merely to compensate for the prior judicial interpretation, it need only have referred to duties "enjoined by statute, rule or regulation." That it did not do so conclusively suggests a broadening of the prior standard.

In so holding we do not suggest that the duty of a district attorney to prosecute is nondiscretionary. We reject respondent's contention that section 927 of the County Law imposes a nondiscretionary duty to prosecute. The history of that section clearly establishes that it was intended to broaden the power of the district attorneys rather than to limit their discretion *(Matter of Lewis v Carter,* 220 NY 8). If the statement contained in section 927 be a mandatory injunction, then the district attorney's duty to prosecute would be the proper subject of an action for mandamus. However, this is clearly not the case *(Inmates of Attica Correctional Facility v Rockefeller,* 477 F2d 375; *People v Baker,* 354 F Supp 162;

*Matter of Hassan v Magistrates' Court of City of NY,* 20 Misc 2d 509, app dsmd 10 AD2d 908, mot for lv to app dsmd 8 NY2d 750, cert den 364 US 844).

There is a large amount of discretion in the District Attorney's crime fighting activities and before he can be found guilty of a criminally willful failure of avoiding a responsibility inherent in the nature of his office, that responsibility must be precisely defined. The difficulty of this assignment is graphically illustrated by the dilemma faced by the trial court. The court explained to the jury that a district attorney's duties were largely discretionary, but charged that the jury could find that a district attorney's willful refusal to act may be considered a conscious refusal to perform a nondiscretionary act. This obvious *non sequitur* was engendered by the inability of the prosecutor to establish that the defendants' action, or inaction, was imbued with the necessary criminal intent.

The first official misconduct charge in the indictment alleged that "the defendants failed to conduct an investigation of persons in the Queens District Attorney's Office who were involved in the Ferdinando scheme." During the course of the trial, the prosecutor consistently took the position that 1% a week interest paid on any investment should have alerted the defendants to possible criminal conduct and thereby required them under threat of criminal liability to conduct an investigation into whether the investors were guilty of criminal usury. However, neither the indictment nor the proof elicited at the trial established with any degree of certainty, other than that provided by hindsight, that Ferdinando's scheme should have resulted in investigation of the investors. For one thing, the District Attorney's office would have been investigating its own staff. Yet, acquaintance with the scheme was already common to the entire office; investigation of those who were investors would have revealed nothing further. Also, the fact remains that there was no usury involved.

There is no doubt that this too-good-to-be-true investment opportunity should have raised the suspicions of the investors. Mackell testified that he did not invest because, among other reasons, he considered the investment to be too risky. It may appear upon the record that the defendants were guilty of stupidity and veniality and were unreasonable in what they did. But these qualities are not criminal. And we cannot substitute a reasonable man test for the essential requirement

of criminal intent. Without criminal intent there is no crime here.

The final count of official misconduct was based upon the previously discussed allegation that the defendants failed to disclose their knowledge of the Ferdinando scheme to the Bronx District Attorney's office. Once again, there is nothing in this charge or the evidence presented with respect thereto that relates to Di Paola. His conviction of this count of the indictment was totally unjustified. With respect to Mackell and Robertson, it is clear that their reticence was improper. But it was not criminal. Mackell's obligation to disclose knowledge of certain facets of a crime, the prosecution over which he had jurisdiction or control, is not a duty clearly inherent in the nature of his office. That he might be expected to divulge what he knows as a matter of professional courtesy is not to be denied. Failure to do so may be rude, but it does not constitute the crime of official misconduct.

It must be also pointed out that the evidence fails to establish that Di Paola took part in Ferdinando's felony. Thus, Robertson's failure to advise Bornstein of Di Paola's existence could not have hampered attempts at the apprehension and prosecution of Ferdinando, even assuming some measure of jurisdiction and control by the Bronx District Attorney's office over the investigation. Furthermore, there is evidence upon the record that the Queens District Attorney's office pursued an investigation in order to find Ferdinando after his disappearance. Admittedly, the record establishes that the investigation was rather inept. But it is not clear evidence of a criminally willful refusal to exercise the District Attorney's discretion. We also find an indication of the weakness of the evidence with respect to criminal intent in the dismissal by the trial court, at the close of the case, of the seventh and eighth counts of the indictment on the grounds of insufficiency of evidence. These two counts charged the crimes of official misconduct for failing to lodge a criminal complaint, obtain an indictment or secure an arrest warrant against Ferdinando and for failing to assign an impartial investigator to the case. Since the facts underlying these charges were proven at the trial, it is clear that the trial court was of the opinion that there had been a failure to prove criminal intent. Yet it was the very failure to lodge a criminal complaint, obtain an indictment or secure an arrest warrant that formed the basis for the prosecutor's theory that all the other action or inac-

tion by the defendants was accompanied by criminal willfulness.

Were we not dismissing the indictment, we would grant a new trial because of the many prejudicial errors which occurred during the course of the trial. Although a certain number of errors must be expected in a trial which lasts several weeks, there were transgressions here of such quality and quantity as to severely prejudice the defendants.

The prosecutor was guilty of constant and patent disregard of the basic rules of evidence. Throughout the trial, he engaged in the use of leading and suggestive questions. Although objections to such questions were repeatedly sustained by the Trial Justice, the prosecutor persisted, despite mild rebukes by the Justice. Instead of letting the facts speak for themselves, the prosecutor tried to elicit affirmative evidence of nonfeasance from his own witnesses by using argumentative questions. His questions were designed to suggest and elicit the desired answers. The respondent argues that this was the only way evidence of official misconduct could have been adduced. However, inability to prove one's case does not justify violating the rules of evidence.

Additionally, the prosecutor repeatedly attempted to introduce irrelevant evidence having a severely prejudicial effect. Under the guise of establishing motive, he sought to elicit from his witnesses that the Queens District Attorney's office was a hotbed of corruption governed solely by considerations of political influence. Without any justification, he ensured that the jury learned that the defendants were the subject of Federal investigation. He attempted to show that Mackell's trips to attend conventions of district attorneys were pleasure jaunts taken at the taxpayers' expense. Although representing that he would not refer to hearsay and conclusory statements in the Bronx District Attorney's file, the prosecutor nevertheless read the following from that file: "At present Queens District Attorney's office not pushing investigation." The tactic of reading this information into evidence was obviously designed to convey the impression that the Bronx County District Attorney's office had already found the defendants guilty of official misconduct. The respondent seeks on this appeal to justify its use of this evidence upon the ground that it had never previously agreed not to use it. This is no justification and it was undoubtedly erroneous and prejudicial (see *People v Donnelly,* 42 AD2d 595).

The prosecutor committed further error during the course of his summation. In describing the Ferdinando scheme, he stated, in mock imitation of Ferdinando: "If it's a large amount we will go into the back room, if not, we will just fold it up, I'll put it in the palm of my hand and I'll shake your hand and pass you the money in very much the same fashion that corrupt police officers are paid off by the bookmakers." Then, in describing Ferdinando's flight, he stated: "He had only one solution. There were policemen, investigators, District Attorneys in this scheme. He didn't want a bullet in his head. He didn't know how to get out of it, so he left." The prejudice in these remarks is patent. The defendants were first compared with bookmakers and corrupt policemen and then the prosecutor suggested that Ferdinando had reason to fear that his life was in danger from someone connected with the defendants, if not one of the defendants himself. The innuendo that the defendants had committed crimes other than those they were charged with, or that they were capable of committing such other crimes, was totally uncalled for and improper.

During the course of the trial, there were many occasions when evidence which was admissible only against one of the defendants or only for a particular purpose was received by the court only as to that defendant or as to that issue, but also subject to connection to other defendants or other issues. As one example, Ferdinando's records were received in evidence as to all the defendants on the material issue of whether he had committed a felony and also "subject to connection on all other issues where it might be relevant." Unfortunately, this instruction, repeated in various forms many times during the course of the trial, was never explained by the court to the jury. And the court did not marshal the evidence. In this trial, the transcript of which runs for thousands of pages, it was incumbent upon the court to properly instruct the jury as to the many distinctions which had to be drawn before the evidence could properly be considered. It was improper for the court to take proof subject to connection and then never rule as to the possible effect of such proof.

In his charge on the question of reasonable doubt, the court used the same " 'in your hearts and conscience' " phrase that was criticized by the Appellate Division, First Department, in *People v Johnson* (46 AD2d 123, 127), *People v Bell* (45 AD2d

362, 364 [concurring opn.]) and *People v Harding* (44 AD2d 800) and by this court in *People v Levy* (47 AD2d 12).

During testimony given by defendant Mackell, there were many instances where the court sustained the prosecutor's objections that the witness was making gratuitous remarks, where the court accused the witness of being verbose, ordered the witness to be responsive and suggested that the witness was not telling the truth. On the other hand, there were many times when the People's witnesses were unco-operative, verbose or unresponsive on cross-examination where defense counsel's complaints were met with the court's admonition not to interrupt and interfere with the witness. The over-all impression given by this juxtaposition is that the court unduly favored the prosecutor and his cause. This impression is buttressed by the fact that defense counsel's zeal brought forth harshly censorious language from the Bench, whereas there are intimations on the record that the prosecutor continuously intimidated witnesses by shouting at them without so much as one word of reproval from the court.

Finally, we note that the trial court, without notifying the attorneys, allowed members of the press to purchase daily copy of the trial transcript. While we make no effort at this time to determine the propriety of such an arrangement, we do hold that, at the very least, the attorneys were entitled to know that their *in camera* and side-bar discussions were being made available to the press.

We do not advert to other errors committed upon the trial, since they are cumulative with regard to violation of legal principles already discussed hereinabove.

BENJAMIN, J. (concurring). I agree completely with the learned opinion of my distinguished colleagues reversing the judgment and dismissing the indictment as wholly unsupported by the evidence. I am fully convinced, however, that the conviction is totally insupportable as a matter of law.

It is a strange scenario, reminiscent of Gilbert and Sullivan at their best. Ferdinando, an admitted, self-confessed "Ponzi" racketeer, pleaded guilty and received but a conditional discharge.

The District Attorney and others associated with his office, from whose prosecutorial activities Ferdinando sought to escape, now find themselves prosecuted by the Special Prosecutor for not having done the very thing that Ferdinando

complained they were doing too vigorously, and have been convicted on such a charge.

· The maze in Alice in Wonderland is much more easily understandable than such an absurd miscarriage of justice. Whatever else members of the Mackell organization may have been guilty of, it certainly cannot be said that they were guilty of willfully, wantonly and with criminal intent failing to zealously prosecute this criminal, who, almost literally, broke down the doors of the State and Federal courts in a frantic effort to avoid their very prosecution, which the Special Prosecutor now claims was inadequate to the point of constituting criminal nonfeasance in office.

If there was any substance to a charge that Mackell and any of his associates shared with Ferdinando the guilt of the swindler's misconduct, they should have been indicted and prosecuted for such acts. There has been no such indictment. To claim that they did not prosecute Ferdinando upon this record is manifest absurdity.

I concur in the dismissal of the indictments for the reasons stated by my colleagues and for the views expressed herein, upon the law and the facts.

MARTUSCELLO, Acting P.J., COHALAN, CHRIST, BRENNAN and BENJAMIN, JJ., concur in *Per Curiam* opinion; BENJAMIN, J., with a separate concurring opinion.

Judgments of the Supreme Court, Queens County, rendered April 22, 1974, reversed, on the law and the facts, and indictment dismissed.