Jasen, J.
(dissenting). I am unable to agree with the disposition of this case.
The defendants, Thomas J. Mackell, the former District Attorney of Queens County, James D. Robertson, former Chief Assistant District Attorney and Mackell’s son-in-law, and Frank R. Di Paola, an investigator in the District Attorney’s office and a close associate of Mackell, were each convicted, after a jury trial, of two counts of conspiracy in the fourth degree, two counts of hindering prosecution in the third degree, and two counts of official misconduct. The Appellate Division reversed the convictions and dismissed the indictment principally upon the ground that the requisite elements of each of these three offenses had not been established by the prosecution as a matter of law. (47 AD2d 209.) In my opinion, *66 this determination was wrong, egregiously wrong, and in a world more concerned with substance and reality than form and technicality, would be set aside. Yet today our court, the highest tribunal in the State, refuses to examine the merits of the case because the Appellate Division, ruling upon a law question with the knowledge that this court may review law questions and law questions only, included three little words in its order, "on the facts”. The majority today holds that the use of these three technical words divests the court of jurisdiction to review the merits, even though the Appellate Division’s reversal was undoubtedly solely on the law. I cannot accept the proposition that the jurisdiction of the Court of Appeals can be so easily frustrated, either through inadvertence or by deliberate design. In my view, the decision of the Appellate Division cannot withstand the careful scrutiny dictated by a fair sense of public justice, particularly since these three defendants have held positions of public trust in the criminal justice system, positions which require a special rectitude and a fierce devotion and dedication to both the law and to fundamental justice, and the acts they have indisputably committed were in patent violation of their official responsibilities. The decision of this court is no less regrettable as it sanctions, upon the basis of a technicality totally unsupported by the record, what can only be termed a miscarriage of justice, in the truest sense of the term. At a time when public confidence in the courts and in lawyers is at an exceedingly low ebb, this court refuses to review a fundamental wrong because there are three special lawyer’s words, words which have meaning only to members of the bar, in the technical language of the Appellate Division’s order of disposition. Of equal significance and perhaps of greater long-range import, the majority’s decision threatens the efficacy and vitality of the appellate process itself since the court will now honor recitals in Appellate Division orders designed to insulate law decisions from further review. For the reasons which follow, I believe that this court may properly take jurisdiction of the entirety of this case and I decline to concur in a decision which incorrectly refuses to review an erroneous determination of law, thereby frustrating the very purpose for which the people of this State created the Court of Appeals.
The State Constitution limits the jurisdiction of the Court of Appeals in criminal cases, other than where the judgment is of death, to the review of questions of law. (NY Const, art VI, *67 § 3, subd a.) The general preclusion of review of the underlying factual basis for convictions is the sole limitation that is imposed by the Constitution. In every other respect, the Legislature may regulate the manner in which appeals in criminal cases are taken to this court. (NY Const, art VI, § 3, subd b.) Until 1971, the criminal jurisdiction of the Court of Appeals was governed by the Code of Criminal Procedure, first enacted in 1881. Under the code any aggrieved party could appeal from an order of an intermediate appellate court which affirmed or reversed a judgment of conviction or which affirmed or reversed a judgment for the defendant on a demurrer to an indictment, provided that a certificate granting permission to appeal was obtained. (Code Crim Pro, § 519, subds 1, 2.) It was recognized, in light of the Appellate Division’s plenary power to review the facts and to make determinations based upon the weight of the evidence or in the interest of justice, that not all such appeals would involve purely questions of law. In order to guard against the possibility that the Court of Appeals might review an order reversing a conviction and ordering a new trial because the verdict was against the weight of the evidence or otherwise "on the facts”, our court developed a rule requiring the Appellate Division order to recite that the facts had been reviewed but that the reversal was solely predicated upon a question of law. In the absence of this recital, the appeal would be dismissed because of the remaining possibility that the determination was based upon the facts. (People v Redmond 225 NY 206, 209; People v Bergman, 252 NY 346; People v O'Brien, 164 NY 57, 58.) If the order recited that the reversal was based both upon the facts and upon the law, the appeal had to be dismissed. (People v Tomlin, 2 NY2d 758, 759.) Even if there were indications in the opinion of the appellate court that the reversal was on the law and the opinion was embodied in the order, we held that the recital in the order itself was controlling and, thus, not appealable. (People v Moskowitz, 289 NY 69; People v Rossi, 11 NY2d 787, 788; see, also, Spies v Lockwood, 165 NY 481, 483; but see People v Rainey, 27 NY2d 748.) The rule requiring obedience to the recital has been described as a "self-imposed limitation” and is of judicial, not legislative, origin. (Cohen and Karger, Powers of the New York Court of Appeals, § 201, p 754.)
Occasionally, the same rule was applied to orders of appellate courts which reversed and dismissed indictments and *68 informations. (People v Kuland, 266 NY 1, 3; People v Mitchell, 142 NY 639.) However, the sounder and more well-established principle was that an order reversing and dismissing an indictment though recited to be upon the facts as well as on the law, presented a case within this court’s jurisdiction—i.e., whether the indictment was sufficient as a matter of law. (People v Peck, 205 NY 554; People v Bellows, 281 NY 67, 74-75; People v Scheinman, 295 NY 142; Cohen and Karger, Powers of the New York Court of Appeals, § 202, pp 757-758.)
A fundamental corollary to the recital rule permitting the Court of Appeals to search the record behind the recital in cases where the order mistakenly recited that the reversal was on the facts developed as a necessary protective device. Benjamin Cardozo, then a lawyer practicing in New York City, reported, in his work on the Court of Appeals, that: "Cases have, however, arisen where the Appellate Division of the Supreme Court has certified in its order that it had reversed a judgment on the facts, though there were no controverted facts in the cause, nor conflicting inferences to be drawn from conceded facts, nor uncontroverted facts not found in the decision, and hence a reversal on the facts was impossible. In such cases, the Court of Appeals has refused to permit its jurisdiction to be defeated, but has examined the record for the purpose of ascertaining whether any question of fact existed on which a reversal could have been founded. If it finds no such question, it treats the reversal, notwithstanding the recital, as upon the law, and entertains the appeal. If, however, the record discloses any question of fact on which a reversal could have been founded, the court gives effect to the recital, and without considering whether a reversal was in its judgment proper or improper, dismisses the appeal.” (Cardozo, Jurisdiction of the Court of Appeals [2d ed], § 9, pp 15-16.) During his later service on this court, Judge Cardozo wrote that the Court of Appeals may review an order of the Appellate Division reversing a lower court judgment on the facts if "there was no question of fact on which the reversal could be based”. (Ga Nun v Palmer, 216 NY 603, 611.) The court may properly "look into the case for the purpose of determining whether there are controverted facts or inferences to be drawn from conceded facts upon which a reversal upon the facts could be based.” (Hirschfeld v Fitzgerald, 157 NY 166, 176; see People v Caverio, 1 NY2d 657, 659; Otten v Manhattan Ry. Co., 150 NY 395, 401.) Thus, the rule was that if the *69 Appellate Division recited that it had reversed on the facts in a case in which it might plausibly have done so, this court was bound by the recital. If, however, the Appellate Division did not actually base its determination upon a review of the facts, this court, in the interest of protecting the integrity of its jurisdiction, would look beyond the bare recital.
In 1935, the Legislature, for the first time, codified the recital rule by adding section 543-a to the Code of Criminal Procedure. An intermediate appellate court was required in an order reversing or modifying a judgment of the trial court to state whether its determination was based upon the law, or upon the facts, or upon both the law and the facts (subd 1). If the determination was based upon the law alone, the order had to specify whether the findings of fact below had been reviewed (subd 2). An opinion could not supply deficiencies in the order itself, if the opinion was not referred to in the order (subd 3). (See People v Mendola, 2 NY2d 270, 274.) If the order did not comply with the statutory requirements, the Court of Appeals was to presume that questions of fact had not been passed upon by the appellate court (subd 4).
Contrary to the assertions in the majority opinion (p 62) as well as in Chief Judge Breitel’s- concurrence (p 64), the enactment of the Criminal Procedure Law in 1971 did not work any substantive change in the appellate jurisdiction of the Court of Appeals. A party adversely affected by an order of an intermediate appellate court may appeal the order to the Court of Appeals, provided a certificate granting leave to appeal is obtained. (CPL 450.90, subd 1.) The order appealed from, however, must "expressly” state that a reversal or modification of a lower court order is "on the law alone”. (CPL 450.90, subd 2, par [a]; see CPL 470.10, 470.15.) The requirement of the express statement can hardly be described as a new one. (See, e.g., People v Conroy, 97 NY 62, 72 [1884] [Huger, Ch. J.]; People v Mitchell, 142 NY 639 [1894], supra; People v Calabur, 178 NY 463 [1904].) Indeed, the Practice Commentary, which was derived from the comments of the Staff to the Temporary Commission on Revision of the Penal Law and Criminal Code, itself notes that the principle is a "familiar” one. (Denzer, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 450.90, pp 396-397.) Thus, it cannot be that the Legislature, by enacting the Criminal Procedure Law, changed the law or even intended to do so, to preclude this court from examining the record in order to *70 prevent a bare recital in an intermediate court order from depriving an appellant of a rightful appeal. The majority’s reliance on the bare wording of the statute ignores and overlooks the history, development and purpose of this legislation. The issue before us "cannot be answered by closing our eyes to everything except the naked words of the [statute]. The notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification.” (United States v Monia, 317 US 424, 431 [Frankfurter, J., dissenting]; see People v Brooks, 34 NY2d 475, 478 [Jones, J.].) The majority draws from one word what it considers to be the "plain import” of the statute (p 63). In doing so, it ignores the century of experience and precedent upon which the statute is based. Contrary to the assertion in Judge Fuchsberg’s opinion, I do not ignore the statute; I seek to apply it as it was meant to be applied and as similar statutes were applied by our court for years past.
As the majority opinion notes, we have on several recent occasions dismissed appeals from orders of the Appellate Division which recited that the determinations involved were based on the law and the facts. (See People v Crimmins, 36 NY2d 230, 236; People v Pendleton, 35 NY2d 690.) On the other hand, it was held that where an order states that the determination was on the law alone, this court could examine the record and inquire into the bona ñdes of that recital. (People v Williams, 31 NY2d 151, 153.) In Williams we noted, in dicta, that "where there is a recital as to a factual or discretionary decisional predicate, we do not look beyond the order”. (At p 153, citing People v Sullivan, 29 NY2d 937, 938.) Aside from the fact that this statement was not necessary for the decision, it is plain that neither the Williams case nor any of the other cases cited by the majority involve the same practical danger as posed by the decision in this case. I would agree that, generally, it is better practice not to search beyond the recital. A short writing by the intermediate appellate court may not express the entire reasoning of the court. Moreover, the result may have been concurred in by some of the Judges based upon their own view of the facts. (See Harris v Burdett, 73 NY 136, 138.) But these considerations do not obtain where, as here, the Appellate Division filed a lengthy opinion, detailing its own views on purely legal issues. Given the highly charged political atmosphere surrounding this case and its controversial prosecutor, we should view the recital for *71 what it is: an effort to deprive the People of a rightful appeal, and to insulate the decision from review by the highest tribunal in the State. In such cases, we have never before declined to accept jurisdiction. The court should not now countenance so guileful an affront to this court’s jurisdiction.
In sum, the majority’s reliance on the bare language of CPL 450.90 (subd 2, par [a]) and, in turn, upon the bare wording of the Appellate Division recital, is misplaced. The statute and its words did not spring forth suddenly from the Legislature in 1970. Rather, the statute is based upon and incorporates rules pronounced by this court in decisions over the course of nearly one hundred years. Never before in our decisions have we permitted an intermediate appellate court to insulate its decision from our review by adding any number of magic words. We should not do so now. The integrity of the administration of justice and of our court’s jurisdiction are far too important to be given so cavalier a treatment.
Review of this case would not violate the constitutional limitations on our jurisdiction. The legal sufficiency of the evidence presents only a question of law and no questions of fact. As the Chief Judge correctly states, the only issues discussed by the Appellate Division in its opinion were purely legal issues (p 64). Thus, while we should be ever mindful of the constitutional limitations on our jurisdiction, reviewing this case on the merits in accordance with our long-standing rules does not in any measure threaten a violation of the constitutional principles. I do not urge that we review questions of fact; I say only that the Appellate Division cannot create questions of fact where there are none and should not by so stating divest this court of jurisdiction to review a substantial, important question of law. (Otten v Manhattan Ry. Co., 150 NY 395, 401, supra.) Indeed, the view I adopt serves to respect the careful delineation of powers made in the Constitution between the Court of Appeals and the Appellate Divisions. I would only encourage others to be so circumspect.
The Criminal Procedure Law did effect one major change in the law. Under the code it was uniformly held that a reversal of a conviction on the facts, predicated on the weight of the evidence, did not authorize dismissal of the accusatory instrument. (See, e.g., People v Klose, 18 NY2d 141; People v Nappi, 18 NY2d 136.) However, section 470.20 (subd 5) of the Criminal Procedure Law mandates that an intermediate appellate court dismiss the charge as to any count on which a convic *72 tion is reversed on the facts. Another subdivision of the same section continues the traditional rule requiring dismissal of the charge where a judgment of conviction is reversed for legal insufficiency of trial evidence. (CPL 470.20, subd 2.) The effect of this section was to add an additional ground for dismissing the accusatory instrument. This did not, however, change the law respecting the appealability of such dismissals. It was and is the law that a dismissal of an indictment for legal insufficiency presents a question of law which the Court of Appeals may review, "even though the Appellate Division may have specified that its reversal was on the facts or on the law and the facts.” (See Cohen and Karger, Powers of the New York Court of Appeals, § 202, p 758; People v Bellows, 281 NY 67, 75, supra; People v Peck, 205 NY 554, supra.)
Indeed, the Legislature strengthened the appealability sections by expressly permitting appeals where the corrective action by the intermediate appellate court is alleged to be illegal. (CPL 450.90, subd 2, par [b].) In this case, the majority concedes, as it must, that this court may review the corrective action taken by the Appellate Division—i.e., the dismissal of the indictment. Although the Appellate Division addressed itself principally to the issue of the legal sufficiency of the indictment, the court also expressed the view that the trial court and the prosecutor had committed prejudicial error during the course of the trial. Of course, if these claims of error were the basis for the Appellate Division’s order, the appropriate remedy would be the granting of a new trial, not the dismissal of the indictment. (CPL 470.20, subd 1.) Thus, there is a significant question as to the propriety of the Appellate Division’s action in directing dismissal of the indictment. If the Appellate Division erred in its resolution of the legal issues it considered, its corrective action would be illegal and appealable. (Pitler, New York Criminal Practice Under the CPL, 1975 Supp, p 336, n 89.) Thus, under subdivision 2 (par [b]) of section 450.90 there is no question that an appeal may properly be taken. Once the appeal is properly before us, we should not, as the majority insists, put on blinders and refuse to review all the issues in the case.
In my view, our prior decision on the motion to dismiss in this case does not preclude our reviewing the entire appeal on the merits. Our decisions on preliminary motions, while entitled to great weight, are not binding law of the case where the appeal continues before us. For example, in People ex rel. *73 Uviller v Luger, we denied a motion to dismiss the appeal for lack of substantial constitutional issues. (36 NY2d 873.) However, after hearing oral argument, we transferred the case to the Appellate Division for that very reason. (38 NY2d 854.) The conclusion to be drawn is that where a case is retained, as against a motion to dismiss, the preliminary decision denying the motion does not preclude later reconsideration when the case is before us on the merits. The traditional rule is that litigated issues are finally adjudicated only by a final judgment on the merits. Although the form of the decision is not determinative, if the proceeding before the court is limited in scope and particular questions are resolved only provisionally, a decision in any form must be given effect only within the same limitations. (Bannon v Bannon, 270 NY 484, 491.) Since we elected to retain this appeal and did not dismiss it, we may review the entire case, notwithstanding our prior determination.
I note that the Chief Judge, joined by two of my colleagues, recommends a change in the Criminal Procedure Law to explicitly authorize this court to review questions of law following a conviction for a crime, even though the order would provide that the conviction was reversed on the law and on the facts. (Concurring opn of Breitel, Ch. J., p 64.) In my view, a statutory revision is not necessary for us to review the merits of this case since the authority to do so is inherent in our decisions for the past hundred years. The majority not having agreed with me, the issue is settled and I believe the need for legislative action is all the more acute. Since our court will now be bound by the conditions of the recital, express authority to review law questions despite the technicalities of recitals is essential to the continued vitality of our criminal jurisdiction. On this basis alone, I concur in the suggestion of the Chief Judge and respectfully urge prompt legislative action.
Upon the merits of these appeals, I conclude, after a review of the record, that there was sufficient evidence, indeed overwhelming evidence, not only to support the indictment, but to support the convictions as well. The contrary conclusion drawn by the Appellate Division can only be described as wrong.
Joseph Ferdinando operated an illegal "Ponzi” swindle in the backroom of a Queens bar owned by defendant Frank Di Paola. Ferdinando would inform potential investors that he *74 was an agent for factors, "shylocks”, persons who would loan money at usurious interest to others with poor credit ratings who could not obtain loans from legitimate lending institutions. These transactions were entirely in cash, for the ostensible purpose of avoiding detection by the Internal Revenue Service. According to Ferdinando’s testimony, he simply collected the money from one investor in order to have money to turn over as "interest” to another investor. "I collected from Peter and gave it back to Paul in interest. And it mounted and mounted. I couldn’t stop. I had to continue.” Eventually, Di Paola, at the time an assistant to then State Senator Thomas Mackell, approached Ferdinando and sought to invest in Ferdinando’s "factoring” business. Between 1968 and December, 1970, Di Paola invested $75,100 in the scheme and took back $99,883 in profits, in addition to the return of his investment. Of the over 400 persons who invested in Ferdinando’s scheme, at least 17 were employed at the District Attorney’s office. After Mackell’s election as District Attorney, Di Paola also served as Ferdinando’s "collector” in the District Attorney’s office. Di Paola and an associate would skim off some of the "interest” intended for the investor, retaining it for themselves. Di Paola also invested some money in the scheme for the benefit of Thomas Mackell. The notes to evidence the transactions were first placed in Mackell’s name, but the original notes were later destroyed and replaced with notes in the name of Mr. and Mrs. James Robertson. Eventually $5,000 was invested in Mackell’s name, with a net profit of $7,000 resulting from the investment. James Robertson personally invested $21,500 in 13 separate transactions, receiving a net gain of $11,475.
The scheme began to unravel on March 13, 1971, when Ferdinando was robbed in his apartment, at gunpoint, of approximately $84,000 in cash receipts. After the gunmen had left, Ferdinando called Di Paola to advise him of the robbery. Di Paola, now a detective employed by the Queens District Attorney, told Ferdinando to meet him at the bar, advising him, "Don’t tell anyone about this, we’ll take care of it.” Ferdinando was met at the bar by Di Paola and another detective. They again advised him not to tell anyone about the robbery, "Just keep your mouth shut. Because if you go to the cops, it’s trouble.”
Two days later, Ferdinando fled New York for San Francisco and did not tell anyone of his intended destination. Di *75 Paola advised Ferdinando’s wife not to report the disappearance to the police: "Don’t report it to the police. Don’t do nothing. A lot of people can get in trouble over this here.”
In May, 1971, one of Ferdinando’s investors filed a complaint with the Bronx District Attorney, advising that personnel in the Queens District Attorney’s office were involved in the scheme. An Assistant District Attorney was assigned to the case and, after investigation, concluded that the allegation of such involvement had been mere "puffing” on Ferdinando’s part. Bronx District Attorney Burton Roberts telephoned Mackell and advised him of the investigation. Mackell told Roberts that it was better to refer the case to the Queens District Attorney’s office than to the State Investigation Commission. Roberts had no objection, but noted that "it might be wise to be circumspect about who was assigned to the case so that the whole office wouldn’t know that the investigation was proceeding.” Although Mackell, by his own Grand Jury testimony, had been aware of the scheme since 1968, he never reported this information to Roberts. Moreover, he proceeded to assign his son-in-law Robertson to head the investigation, despite his knowledge that Robertson had been an investor in the scheme. During subsequent conversations with an Assistant District Attorney from Bronx County, Robertson at first stated that he did not know of anyone on the Queens District Attorney’s staff by the name of "Frank” (Di Paola). Later, Robertson advised that no such person was on the staff.
In March, 1972, two private citizens who had invested with Ferdinando learned of his whereabouts and met with him. He agreed to return to New York where he was arrested. At the time of the arrest Mackell and Robertson were out of town. Mackell subsequently telephoned his office and told a deputy that the case was "to be handled carefully and not to be the subject of press releases”. The deputy was informed, in substance, that there were office personnel involved, that the case had to be handled delicately, that no one was to be embarrassed by any notoriety and that persons involved in the scheme, whoever they were, should not work on the case.
While the Ferdinando case was being presented to a Grand Jury, the deputy advised Mackell that Di Paola had been more than a simple investor, but had been a collector of investments. When the question arose as to whether the transactions were a violation of the usury laws, Mackell replied that the scheme "was a joint venture and outside the *76 jurisdiction of the usury laws”. Moreover, Mackell told his deputy that "he knew a lot more about this case than I did.”
Later, Federal authorities sought to obtain Ferdinando’s custody and served a habeas corpus writ upon the Warden of the Queens House of Detention. Mackell advised his deputy to resist the Federal warrant because "it would cause trouble” for the District Attorney. When later interviewed by a Federal prosecutor, Mackell refused to co-operate or provide assistance, at one point stating, "when is it going to stop? We’re the most investigated office in the country!”
From even this summary recital of the massive amount of evidence, it is plain that there was, manifestly, sufficient evidence for the jury to find, as it did, that the charges against the defendants were sustained.
The crime of official misconduct is committed when a public servant, with the intent to obtain a benefit or deprive another person of a benefit, either engages in an unauthorized exercise of his official functions or knowingly refrains from performing a duty imposed by law or which is clearly inherent in the nature of his office. (Penal Law, § 195.00.) There is not the slightest doubt that all three defendants were public servants. (Penal Law, § 10.00, subd 15.)
The official misconduct charges filed by the Grand Jury alleged that the defendants failed to prosecute Ferdinando for various crimes, until his arrest was brought about by private citizens. Secondly, it was charged that the defendants failed to assign a fair and impartial prosecutor to the Ferdinando investigation. These charges were established by competent proof. There is evidence that, commencing immediately after the robbery of Ferdinando, Di Paola, despite his employment as a detective, attempted to discourage witnesses. Each of these defendants knew of Ferdinando’s scheme for nearly three years prior to his actual arrest and yet failed to investigate it or prosecute him. The Appellate Division excused this dereliction of duty on the grounds that the District Attorney’s office would have to investigate its own staff and that in any event no usury was involved. (47 AD2d, at p 218.) With this view, I cannot concur. First, the District Attorney is charged with the responsibility of prosecuting all crimes committed within his jurisdiction, regardless of who commits them. (See County Law, § 700, subd 1.) It cannot be seriously contended that members of a District Attorney’s staff are immune from the sweep of the criminal law. Nor can it be that the District *77 Attorney may permit his office to become rife with persons engaging in a variety of crimes. Secondly, it is equally unavailing to contend that the scheme was not, in fact, usurious. If it was not, the scheme was an out and out fraud and those participating in it were liable for larceny. (See Penal Law, § 155.05.) In short, there is overwhelming proof that the three defendants deliberately failed to investigate and prosecute this scheme in order to disguise their own involvement with it. This, surely, is official misconduct.
The charges of hindering prosecution in the third degree were also sustained. This crime is committed when a person renders criminal assistance to a person who has committed a felony. (Penal Law, § 205.55.) Joseph Ferdinando had, of course, committed at least one felony, most notably, grand larceny. Frank Di Paola was subject to accessorial liability for his role as "collector”. The Grand Jury charged that defendant committed this crime by deceiving the Bronx District Attorney’s office and hindering that investigation and then by advising certain witnesses that the matter was already under investigation, when, in fact, there was an attempt to cover it up. Again, the record discloses that these charges are supported by substantial evidence. The defendants rendered criminal assistance to Ferdinando by numerous acts, each designed to obstruct others from discovering, apprehending and prosecuting Ferdinando and the others involved in his felonious enterprise. (See Penal Law, § 205.50, subd 4.)
The final set of charges involve the crime of conspiracy. Conspiracy in the fourth degree is committed when, with intent that conduct constituting a crime be performed, a person agrees with others to engage in or cause the performance of such conduct. (Penal Law, § 105.00.) The Grand Jury charged that the defendants had committed this crime by agreeing to render criminal assistance to Ferdinando and by agreeing, between themselves, not to investigate and prosecute these charges. There was substantial evidence from which the jury could find that there was a criminal agreement between the three defendants. Since neither the agreement nor the criminal intent need be proved by direct evidence, they may be proved inferentially. (People v Flack, 125 NY 324; People v Silverman, 252 App Div 149.) Both Mackell and Robertson had participated through Di Paola in Ferdinando’s scheme and obtained, thereby, substantial financial benefits. An obvious part of this arrangement was the tacit understanding that *78 Ferdinando’s activities, while even on the surface suspicious, would not be investigated too closely. Moreover, once the scheme broke down, each of the defendants attempted to hinder prosecutions and to obstruct a detailed investigation. Thus, the jury could reasonably find that this activity was conducted pursuant to a continuing criminal agreement.
One further point requires discussion. The concurring Justice at the Appellate Division indicated his view that the subsequent prosecution of Ferdinando indicates that the defendants did not commit any nonfeasance in office. (47 AD2d, at pp 222-223 [Benjamin, J., concurring].) This, of course, begs the question. It is readily apparent that the three defendants were not, in the slightest, concerned with the best interests of Joseph Ferdinando. Their concern was that a full-scale investigation would reveal that they, while holding public offices, had reaped massive financial benefits from a patently illegal scheme. It avails the defendants nothing to argue that their prosecution of Ferdinando was vigorous once their hand was forced. The record discloses that, like certain other public figures in the recent past, the defendants sought to contain the investigation before their own participation was revealed.
For the reasons stated, I would reverse the order of the Appellate Division and reinstate the judgments of conviction.
Judges Gabrielli, Jones and Wachtler concur with Judge Fuchsberg; Chief Judge Breitel concurs in a separate opinion in which Judges Fuchsberg and Cooke also concur; Judge Jasen dissents and votes to reverse in another separate opinion.
Order affirmed.