OPINION OF THE COURT
Leroy B. Kellam, J.
On October 27, 1982, the Queens County Grand Jury handed up indictments against three employees of the Queensborough Society for the Prevention of Cruelty to Children. Marilyn Dossinger, an intake co-ordinator and supervisor of crisis protective workers, was charged with an 11-count indictment encompassing falsifying business records in the first degree (two counts), falsifying business records in the second degree (five counts), endangering the welfare of a child (two counts), and criminal solicitation in *854 the fourth degree (two counts). George James, a supervisor of the crisis protective unit, was charged with one count of official misconduct and endangering the welfare of a child (three counts). Anthony Higdon, a caseworker, was indicted for two counts of official misconduct and endangering the welfare of a child.
A novel question of law is now presented for the consideration of this court. The issue is to what extent, if any, could criminal liability be imposed upon social workers employed by the Queensborough Society for the Prevention of Cruelty to, Children (to be referred to as QSPCC), for the utilization of their discretionary functions in formulating their decision-making policies regarding whether children who are allegedly abused and neglected should be forcibly removed from the home of their parents prior to the institution of any Family Court proceedings.
In the instant case, the social workers are charged with official misconduct and endangering the welfare of children in that they failed to forcibly remove allegedly abused children, absent any court order, from the homes of their parents. The prosecutor alleges that the failure of these social workers to forcibly remove said children and place them in a temporary residence was tantamount to criminal liability.
A review of the testimony elicited before the Grand Jury indicates that in August of 1982, Anthony Higdon, under the supervision of George James, failed to remove an allegedly abused child, C. F., from the home of her parents and have her placed in a temporary shelter. The child had allegedly been struck by a broomstick causing lacerations and welts. The testimony adduced from witnesses Eugene Figueroa and Roland Thomas, fellow employees of QSPCC, indicated their belief that the juvenile was in imminent danger because of said failure to remove her from her home. The record is devoid of any indication as to when, why, and how these injuries were sustained or as to what, if anything, occurred to C. F. as a result of nonremoval. However, it is imperative to note that these allegations were levied by witnesses whose motives for testifying are in themselves suspect and create an aura of suspicion. One of these “expert witnesses” has been dismissed from em *855 ployment for alleged serious misconduct involving a purported plan to induce a young girl who was in a diagnostic facility to sell narcotics. The other witness readily admitted that he often had the occasion to become embroiled in bitter disputes with his supervisor Dossinger over what role a caseworker should assume in respect to the handling of cases involving alleged abused children. This witness candidly claims that he believes that a caseworker should undertake more “law enforcement” activities such as initiation of arrests as opposed to Dossinger’s “social work” approach which attempts to solve problems through a rehabilitative and nonviolent mechanism. Moreover, even the People’s alleged “experts” admitted that each social worker utilizes his or her discretion in a different manner than one another.
A further case study which serves as a basis for the indictment filed against George James involves juveniles J. R. and F. R. Testimony elicited before the Grand Jury alleges that James failed to act properly in his refusal to forcibly remove these juveniles from their parents’ home. The caseworker witness, who himself was dismissed from employment for misconduct, testified that the presence of a large accumulation of garbage stacked outside the house coupled with his observation of a scar on J. R.’s wrist mandated the immediate forcible removal of these children from their home.
J. R. had indicated to the caseworker that he obtained the scar by falling off his bicycle. There was absolutely no testimony as to any abuse or neglect concerning F. R. Furthermore, the witness stated that he had consulted with James’ supervisor, Beverly Sanders, and the latter’s decision to allow the children to remain on those premises comported with that of defendant James. Noteworthy is the fact that the Family Court subsequently presided over a hearing in this matter and decided that it was in the best interest and welfare of J. R. and F. R. to permit them to remain in their home.
Defendant Dossinger was further charged with official misconduct and endangering the welfare of children in that she refused to order the removal of juveniles R. S. and G. S. from their home and placed in temporary shelters. *856 R. S. was observed to have numerous lacerations and bruises throughout the body. The parents of R. S. and G. S. indicated to the social worker that the injuries incurred by R. S. were the result of a bathroom accident. The mother on another occasion admitted hitting the child. The People’s witness, Lucky Riley, claimed that forcible removal of these children was warranted. He further testified that he had requested permission from Dossinger to arrest the mother, but was advised by Dossinger that it wasn’t agency policy to effectuate the arrest. Riley was informed that the case was being handled at that time by the Bureau of Child Welfare. Moreover, it should be emphasized that three doctors who conducted the examination of R. S. in the hospital found no proof that the child had been abused nor that the injuries did not result from an accident. This opinion was shared by witness Alba Jamie, an employee of the Bureau of Child Welfare.
At the outset, it must be noted that the concern of the District Attorney over the plight of the abused and neglected children is shared by this court. Nevertheless, courts have a particular responsibility to prevent unfairness in Grand Jury proceedings, for the Grand Jury is an arm of the court. (Matter of Spector v Allen, 281 NY 251; People v Ianniello, 21 NY2d 418.)
Indeed, the Court of Appeals, in evaluating the role of a prosecutor has stated: “[ujnlike other participants in the traditional common-law adversarial process, whose more singular function is to protect and advance the rights of one side, a District Attorney carries an additional and more sensitive burden. It is not enough for him to be intent on the prosecution of his case. Granted that his paramount obligation is to the public, he must never lose sight of the fact that a defendant, as an integral member of the body politic, is entitled to a full measure of fairness. Put another way, his mission is not so much to convict as it is to achieve a just result”. (People v Zimmer, 51 NY2d 390, 393.)
The Grand Jury minutes are replete with nothing more than an accumulation of innuendos, hearsay, and second guessing of the discretion exercised by the social workers in the performance of their duties. Notwithstanding the fact that these defendants were indicted for alleged mis *857 conduct in their decision-making policies regarding five children, the District Attorney nevertheless saw fit to introduce into evidence testimony concerning 23 other instances of child abuse without ever remotely connecting those cases with these defendants. This court is unaware of any legitimate purpose served by this aspect of the examination. (See People v Salcedo, NYLJ, Sept. 27, 1979, p 13, col 6; People v Davis, NYLJ, Jan. 28,1983, p 16, col 1.) For example, the prosecutor repeatedly attempted to introduce irrelevant evidence having a severely prejudicial effect. This included references to an unrelated case of a baby death caused by parental abuse. Such tactics have been condemned to the extent that the court in People v Mackell (47 AD2d 209, 220) indicated that “inability to prove one’s case does not justify violating the rules of evidence.”
A Grand Jury may only return an indictment when the evidence before it is legally sufficient to establish that the defendant committed the offense and competent and admissible evidence before it provides reasonable cause to believe that defendant committed the offense. (See CPL 190.65, subd 1.)
Upon reviewing the instant testimony in the light most favorable to the People, the court finds that the evidence presented before the Grand Jury served as nothing more than the substitution of the People’s witnesses’ judgment as to how they would have exercised their discretion in several isolated cases concerning allegedly neglected children as opposed to the manner in which the defendants elected to act. This court views the testimony of the People’s witnesses as merely a difference of opinion concerning the exercise of a discretionary function.
A social worker’s decision about how to deal with allegations of abuse is a matter of judgment and discretion. No law mandates that a social worker act in any particular manner. Indeed, the law that authorizes removal of abused children is expressly permissive. The operative language of the governing statute (Family Ct Act, § 1024, subd [a]) reads: “[a] peace officer, acting pursuant to his special duties * * * or an agent of a duly incorporated society for the prevention of cruelty to children * * * may take a child into protective custody * * * without an order * * * and *858 without the consent of the parent or other person legally responsible for the child’s care * * * if (i) the child is in such circumstances or condition that his continuing in said place of residence or in the care and custody of the parent or person legally responsible for the child’s care presents an imminent danger to the child’s life or health”. (Emphasis added.)
Unequivocally stated, the social worker has the authority but not the obligation to remove a child. The discretionary nature of the authority to remove a child is highlighted in the “Guidelines for Emergency Removal” used by the QSPCC. Those guidelines read: “In assessing the protective needs of a child, or the need for emergency child protective custody, there is no substitute for judgment. These guidelines seek to draw attention to the salient indicators that abuse/neglect has happened or has the potential for occurring. They also seek to illustrate the difference between deciding whether a child is abused/neglected, and whether emergency removal is warranted. They are meant to help focus consideration on the important issues facing a child protective worker. They are not meant to be applied mechanically. The presence of one of these indicators alone does not necessarily prove that abuse or neglect exists or that a child should be placed in protective custody”. (Emphasis added.)
On May 1,1970 the Legislature of the State of New York repealed article 3 (child neglect) and article 10 (child abuse) of the Family Court Act and combined features of each into a new article 10. Under the new article 10, upon the finding of child abuse, it is no longer mandated that a child be removed from his home. On the contrary, it is specifically provided that the court may remove the child to avoid imminent danger to the child’s life or health, may issue an order of protection, or may release the child to the custody of his parent. (Family Ct Act, § 1027; Matter of Walsh, 64 Misc 2d 293.) Furthermore, article 10 is not to be viewed as a punitive measure designed to interfere with the parental function, but rather as a mechanism to safeguard the physical, mental and emotional well-being of the child. (See Matter of Walsh, supra.)
*859 The law further recognizes that parental custody is always preferable unless the realities of the situation mitigate against even a temporary custody to the parents at that time. Also, the action of removal of a child from his home should not be undertaken on mere suspicion alone that such child is being abused. More than a mere suspicion on behalf of a caseworker is necessary before a child is to be removed from the sanctuary of his home (cf. Matter of Fred S., 66 Misc 2d 683; Matter of Edwards, 70 Misc 2d 858).
The law is well settled that only in grave and urgent circumstances should a child be removed from the care and custody of his parents’ home and placed in the custody of the Department of Social Services. (Matter of Urdianyk, 27 AD2d 122.) Moreover, “the Family Court Act * * * contemplates a continuation of the child with a parent, with appropriate regulation of the home to assure that the child’s care and upbringing shall be proper.” (Matter of Urdianyk, supra, p 123; cf. Matter of Carmen, 37 AD2d 629.)
Indeed, in Besharov’s Practice Commentary to section 1022 of the Family Court Act, it is noted: “In most child abuse and child neglect situations, the child need not be removed from his parent’s custody in order to protect his well-being and future development. Indeed, removal may be harmful to the child — the child may see separation from the parents as a deprivation or as a punishment for his own inadequacy. And removal may hinder treatment efforts — it may destroy the fragile family fabric and make it more difficult for the parents to cope with the child when he is returned to their care.” (McKinney’s Cons Laws of NY, Book 29A, Part 1, 1982-1983 Supp Pamph, p 499.)
Furthermore, Mr. Besharov emphasizes that: “[o]nly in urgent situations, when the child’s life or safety is in imminent danger and there is no time to apply for a court order, does this section authorize the removal of a child without court review. This section places a further restriction on removal without prior court order by establishing a factual, objective test rather than one based on state of mind. Thus, instead of authorizing protective custody when a child ‘appears’ to be in imminent danger, subdivi *860 sion (a)(i) réquires that a child in fact be ‘in such circumstance or condition that his continuing in said place of residence * * * presents an imminent danger to the child’s life or health.’ Examples of such situations include: when children are being attacked or are about to be attacked by their parents; when children need immediate food, clothing, shelter, or medical care; when young children are left alone and unattended; or when it appears that the entire family may disappear before the facts can be sorted out.” (Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Part 1,1982-1983 Supp Pamph, Family Ct Act, § 1024, p 502.)
Upon reviewing the above-mentioned commentaries, it becomes readily apparent that the forcible removal of the children in the case at bar from their homes may possibly have been in contravention of the legislative dictate, and more importantly, not in furtherance of the best interest of these children. However, notwithstanding the existence of these guidelines which tend to demonstrate that the defendants were quite possibly pursuing the proper course of behavior in dealing with these children, the District Attorney nevertheless ignored these guidelines and saw fit to allow his witnesses’ perhaps own misguided judgment to serve as the basis for the instant indictments.
The lack of sufficient evidence necessary for the procurement of this indictment is underscored by immunity status afforded these defendants by the Legislature. A review of subdivision (c) of section 1024 of the Family Court Act provides: “Any person or institution acting in good faith in the removal or keeping of a child pursuant to this section shall have immunity from any liability, civil or criminal, that might otherwise be incurred or imposed as a result of such removal or keeping.”
Furthermore, the interpretation of subdivision (c) of section 1024 of the Family Court Act as contained in Besharov’s Practice Commentary provides: “Sub[division] (c) explicitly grants immunity to those acting ‘in good faith’ in order to calm fears of unjust lawsuits. Even without such a specific grant of immunity, good faith would probably be an absolute defense against such lawsuits. Nevertheless, the Legislature apparently concluded that in order *861 to insure the fullest, yet appropriate, utilization of protective custody it was necessary to eradicate all vestiges of uncertainty concerning liability.” (McKinney’s Cons Laws of NY, Book 29A, Part 1, 1982-1983 Supp Pamph, p 503.)
Similarly, section 419 of the Social Services Law provides: “Any person, official, or institution participating in good faith in the * * * making of a report, the taking of photographs, or the removal or keeping of a child pursuant to this title shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions. For the purpose of any proceeding, civil or criminal, the good faith of any such person * * * required to report cases of child abuse or maltreatment * * * shall be presumed”.
The District Attorney’s assertion that the Grand Jury weighed this “good faith” immunity provision during its deliberations but found it to be overcome by the weight of evidence is totally unfounded in light of the fact that the prosecutor never instructed the Grand Jury as to the existence of these immunity statutes.
It should be further noted that the District Attorney’s interrogation of defendant Anthony Higdon within the District Attorney’s office, in the absence of his attorney notwithstanding the fact that the District Attorney had actual knowledge of his representation by counsel, was improper. The District Attorney’s allegation that said interview was conducted in a noncustodial setting is immaterial. The Court of Appeals has specifically held that the right to counsel indelibly attaches to a suspect not in custody who is questioned about a matter under investigation in relation to which he is known by law authorities to have obtained counsel. (People v Skinner, 52 NY2d 24.)
In respect to the counts of the indictment charging criminal solicitation in the fourth degree and falsifying business records in the first and second degrees, respectively, the evidence presented before the Grand Jury failed to demonstrate with any specificity the nature of the records allegedly falsified, and to what extent, if any, they were falsified. The record is barren of any indication as to what the original business records consisted of and how they were subsequently falsified. Therefore, these counts must be dismissed.
*862 This court exhibits grave concern over whether the filing of these indictments will have a chilling effect upon other social workers who are called upon to make immediate judgments concerning the future health and welfare of young children.
In concluding, the District Attorney in his legitimate concern over the plight of the abused children has neglected his obligation to protect the rights of Marilyn Dossinger, George James and Anthony Higdon.
The motion to dismiss each and every count of the indictments of Marilyn Dossinger, George James and Anthony Higdon is granted.