*441
 
 OPINION OF THE COURT
 

 Ciparick, J.
 

 Defendants are all members of the New York City Police Department convicted of various crimes arising out of their entry into two apartments in a Manhattan building where they restrained and threatened the occupants in an attempt to recover a police radio. All four defendants challenge the legal sufficiency of the evidence supporting their convictions for official misconduct (Penal Law § 195.00 [1]). Defendants also allege errors in the jury charge and assert that they are entitled to a de novo
 
 Kastigar
 
 hearing (see,
 
 Kastigar v United States,
 
 406 US 441)
 
 [1]
 
 based on the fact that the People failed to turn over six documents comprising
 
 Rosario
 
 material that had a bearing on the pre-trial
 
 Kastigar
 
 determination. Furthermore, they contend that
 
 Rosario
 
 materials necessary for trial were not turned over by the People. Finally, defendant Rosario individually contends that he received immunity from prosecution by virtue of his testimony before a Grand Jury. The Appellate Division considered these issues and affirmed the convictions. We conclude that these claims either lack merit or are unreviewable, and affirm the convictions in all respects.
 

 Factual Background
 

 On September 26, 1990, in attempting to recover defendant DeVito’s police radio — which had been lost during a prior drug-related incident — defendants pushed their way into the apartment of Denise Jackson, with weapons drawn. Defendant Feerick, a lieutenant with the police force, had been instructed by
 
 *442
 
 her commanding officer to refer the lost radio matter to a detective unit for further investigation or to secure a search warrant for drugs. One apparently had been applied for, but defendants proceeded without it. In the apartment, Theresa Johnson, who was staying with Jackson at the time, was sleeping; Ben Stokes, whom defendants sought to question, rented a room from Jackson, but was not present at the time. The police awakened Johnson, restraining both women while they ransacked the apartment, removing pictures from the walls, emptying the contents of the closets, the kitchen cabinets and the refrigerator, and upending and ripping some of the furniture. Defendants threatened Johnson and Jackson with arrest unless they helped procure the lost radio. At some point, the officers scrawled words to the effect of “Alls we want is the [expletive deleted] radio” on a wall of the apartment. When Maribel Delgado, Stokes’s girlfriend, knocked on the door, she too was searched and detained. Defendants discovered two vials of crack cocaine in Delgado’s possession and threatened her with arrest unless she told them where to find Stokes.
 

 Delgado told them that Stokes might be in another apartment in the building. They proceeded to the second apartment and again forced their way in, with weapons drawn. Delgado was released and never charged for the drugs found on her person that day. Finding Stokes in the second apartment, defendants demanded the return of the police radio in exchange for which they would not prosecute Stokes for the 591 vials of crack cocaine they found while searching the second apartment. Defendant DeVito, back at the precinct, vouchered the vials of crack, falsely indicating on various forms that they had been recovered in the alleyway behind the building, where Stokes had dropped them while running away to avoid arrest. Later that same day, an unidentified person turned the missing radio over to the building’s security personnel, and it was returned to the police.
 

 After defendants left, Jackson called 911 to report the incident. Detective Robert Miller of the Internal Affairs Division (IAD) then began an investigation, which continued for some three months, and Miller kept the District Attorney’s office apprised of developments. Stokes was interviewed but was unwilling to cooperate in any prosecution of defendants. By letter dated January 7, 1991, the District Attorney’s office declined to prosecute defendants, but urged the Police Department to follow up with appropriate disciplinary action. Pursuant to Patrol Guide section 118-9, which requires a member of
 
 *443
 
 the police force to respond to questions under the penalty of dismissal, hearings were held during the remainder of the month of January for all four defendants.
 

 At his hearing on January 18, defendant Rosario stated that he had arrested Stokes for the drugs vouchered on September 26. Rosario had also testified before the Grand Jury on January 11 regarding that arrest. Stokes attempted to contact Miller on January 18, and in their eventual conversations explained his new-found willingness to cooperate with the prosecution. He claimed that defendants violated their part of their agreement — no drug arrest for return of the radio. Advised of these developments, the District Attorney’s office reopened the investigation of defendants, leading to the 30-count indictment here.
 

 Before trial, the court held a
 
 Kastigar
 
 hearing to determine whether the People had made use of any information from the section 118-9 hearings. Three months prior to the
 
 Kastigar
 
 hearing, the People gave defense counsel an index of the worksheets prepared mostly by Miller in connection with the IAD investigation, each with a brief description of its contents. Of the 144 documents, defense counsel requested 127, or all the pre-indictment worksheets. The court reviewed several of these documents in camera and required that three of them be disclosed as
 
 Rosario
 
 material for the hearing. The People also turned over two additional worksheets. Having heard evidence from Miller (the People’s sole witness at the hearing) as well as three defense witnesses, the hearing court determined that the People had met their burden of demonstrating that the criminal prosecution was based on sources independent of defendants’ section 118-9 testimony.
 

 After a jury trial, each defendant was convicted of four counts of second degree unlawful imprisonment, one count of second degree coercion, one count of second degree criminal trespass (except Feerick, convicted of two counts) and one count of official misconduct (except Feerick and DeVito, convicted of two counts). DeVito’s actions in vouchering the drugs led to an independent conviction for falsifying business records in the first degree. Defendant Rosario was also found guilty of perjury in the first degree for his testimony at the Grand Jury regarding Stokes’s drug arrest. The jury acquitted defendants of various counts, including second degree burglary, fourth degree criminal mischief, some of the second degree coercion and the official misconduct counts as well as bribe receiving in the second degree.
 

 
 *444
 
 Defendants’ post-sentencing CPL 440.10 motion to vacate claimed that “immunized testimony was utilized by the prosecution at trial.” On appeal from denial of that motion, which was joined with the defendants’ direct appeal from their judgments of conviction, counsel in a footnote in their brief stated that the People’s failure to turn over the complete IAD worksheet file constituted a separate
 
 Rosario
 
 violation with respect to the pre-trial
 
 Kastigar
 
 hearing. Defendants requested that the
 
 “Kastigar
 
 hearing, at the very least, should be re-opened.” Holding the direct appeal in abeyance, the Appellate Division directed the hearing court to conduct an in camera review of the previously unexamined documents “in order to determine if any of the detective’s undisclosed, preindictment worksheets related to the subject matter of his direct testimony at the
 
 Kastigar
 
 hearing.” (230 AD2d 689, 690-691.) The Appellate Division concluded that “[i]f a
 
 Rosario
 
 violation is found to exist, the
 
 Kastigar
 
 hearing should be reopened to the extent of permitting cross-examination of the detective with respect to the undisclosed worksheets, followed by a de novo
 
 Kastigar
 
 ruling” (id., at 691, citing
 
 People v Banch, 80
 
 NY2d 610, 618-619).
 

 Supreme Court reviewed the specified IAD worksheets and found that six of the documents
 
 [2]
 
 should have been turned over to the defense for the purpose of the
 
 Kastigar
 
 hearing. It then reopened that hearing, at which Miller was questioned regarding the contents of those documents. Defense requests to broaden the scope of the hearing beyond the six documents were denied. The hearing court also denied defendants’ request to call an Assistant District Attorney involved in the case as well as an unidentified “high-level police official” who, defendants claimed, had information relevant to the
 
 Kastigar
 
 issue. After reviewing the transcript of the original hearing and the testimony and arguments at the reopened hearing, the hearing court again decided that the prosecution’s evidence “was derived from sources independent of the immunized testimony of the four defendants.” The entire matter — the direct appeal and the appeal from denial of the 440.10 motion — was returned to the Appellate Division, which affirmed the convictions, one Justice dissenting in part. The dissenting Justice granted leave to appeal, and we now affirm.
 

 
 *445
 
 Official Misconduct — Sufficiency of the Evidence
 

 We first turn to the main claim pressed by the dissent below and by defendants before this Court — that the evidence was insufficient to support each defendant’s conviction for official misconduct (Penal Law § 195.00 [1]). The essence of the claim is that zealous law enforcement is typically not covered by the statute, and that here the recovery of the police radio cannot be deemed a “benefit,” which a public servant must have intended to obtain in order to be convicted of this crime. In their view, the crime of official misconduct occurs only when the public official is “corrupt,” that is, when the official acts with some venal purpose or is engaged in some type of financial dishonesty. Defendants contend that the evidence shows only that they were overzealous, not corrupt.
 

 We agree that good faith but honest errors in fulfilling one’s official duties are not what the Legislature meant to criminalize. That is not this case. The evidence here constituted misconduct from which the jury could conclude that official misconduct as expressed in the Penal Law was committed.
 

 The Legislature intended to encompass flagrant and intentional abuse of authority by those empowered to enforce the law. The current official misconduct statute replaced more than 30 prior crimes, all of which dealt with specific malfeasance or nonfeasance in the accomplishment of official duties (see, Proposed New York Penal Law, Staff Notes of New York State Commn on Revision of Penal Law and Criminal Code [Richard J. Bartlett, Chair], § 200.00 [now § 195.00], at 370-371 [1965]). This recodification specifically included several prior crimes dealing with the misconduct of law enforcement officers.
 
 [3]
 
 Most notably, section 195.00 was designed to replace section 854 of the former Penal Law, dealing with oppression under color of law.
 
 [4]
 

 
 *446
 
 In collecting the previous, narrow statutes directed at particular officials into the current, unitary official misconduct statute, which applies to all public servants, the Legislature sought to ensure that good faith miscalculations in the exercise of official judgment did not run the risk of a criminal prosecution. It incorporated not one but two
 
 mens rea
 
 requirements into the statute. As regards malfeasance under section 195.00 (1) with which the defendants here were charged,
 
 [5]
 
 the People not only must show that the public servant knew his or her acts were an “unauthorized exercise of his official functions” but also must show that the public servant did so with the “intent to obtain a benefit or deprive another person of a benefit” (Penal Law § 195.00 [1]).
 

 It is clear both from the legislative history and from the statutory definition of “benefit” that the official misconduct statute was designed to include gain other than graft or financial advantage. The Bartlett Commission, which drafted and recommended the official misconduct statute, stated that this benefit ingredient “excludes unauthorized conduct or neglect of duty, which, though possibly a proper basis for removal or disciplinary action in some instances, does not seem a fair basis for the automatic imposition of criminal sanctions” (Bartlett Commn Staff Notes,
 
 op. cit.,
 
 at 371). Significantly, neither the statute nor the legislative history limits the statute to “corrupt” or “venal” activities, nor is such a limitation warranted.
 

 The New York Legislature thus intended its statute to replace those statutes prohibiting all manner of abusive acts by public officials, not just those dealing with graft. Indeed, it placed official misconduct in a different article from that of bribery, which deals with very different crimes, including obstructing governmental administration (Penal Law § 195.05); refusing to aid a peace or police officer (Penal Law § 195.10); and obstructing firefighting operations (Penal Law § 195.15). Moreover, that the statute includes activities short of graft is
 
 *447
 
 clearly shown by the fact that “benefit” includes “any gain or advantage” (Penal Law § 10 [17]), and not just monetary gain as some States require (see,
 
 e.g.,
 
 Ark Stat Ann § 5-52-107 [knowing commission of an unauthorized act “with the purpose of benefitting in a pecuniary fashion”]). “Benefit” includes more than financial gain and can encompass political or other types of advantage (see,
 
 e.g., People v Hochberg,
 
 62 AD2d 239 [decision of a possible leading candidate to not run in primary election against defendant candidate based on promises by defendant conferred personal advantage];
 
 People v Abranko,
 
 157 Misc 2d 972 [sexual touching by emergency medical technician];
 
 but see, People v Adams,
 
 86 Misc 2d 634 [no benefit to County Legislature from having another “ghost write” committee report];
 
 People v Cavan,
 
 84 Misc 2d 510 [vague offer to turn State’s evidénce, without more, no benefit];
 
 see also, United States v Gorman,
 
 807 F2d 1299 [6th Cir] [promise of future employment was thing of value under Federal bribery statute]).
 

 Indeed, at least 18 jurisdictions have official misconduct statutes comparable to New York’s in requiring an intent to benefit.
 
 [6]
 
 The reported cases from these jurisdictions do not limit the statute to pecuniary advantage or “corrupt” purposes
 
 (State v Schultz,
 
 71 NJ 590, 367 A2d 423;
 
 [7]
 

 State v Rodda,
 
 56 Ore App 580, 642 P2d 364 [allowing another to bid at auction without being present in contravention of rule sufficient benefit for indictment of official misconduct];
 
 People v Camacho,
 
 103 F3d 863 [9th Cir, applying Guam law] [momentary sexual gratification enough]). New York cases do not suggest otherwise
 
 *448
 

 (see, People v Maloney,
 
 233 AD2d 681 [affirming official misconduct conviction where officer issued seatbelt violation to former girlfriend’s mother, though she was properly restrained at the time, and frequently aimed a police spotlight into house of former girlfriend];
 
 People v Nieves,
 
 197 AD2d 542, 543 [benefit of a “steady, local, and reliable source of drugs” for police officer defendant]). The weight of authority indicates that the official misconduct “statute is intended to cover more than cash bribery or cash extortion”
 
 (People v Camacho,
 
 103 F3d 863, 867,
 
 supra
 
 [interpreting Guam statute almost identical to New York’s and compiling cases]).
 

 Thus, the fact that the New York statute is not as broadly conceived as the Model Penal Code provision because New York additionally includes “intent to obtain or deprive another person of a benefit” as a necessary element, does not mean that the New York statute is different in kind rather than degree. As the Bartlett Commission commentary indicates, the inclusion of this
 
 mens rea
 
 requirement was not to limit in any substantive way the types of conduct that would be culpable, but instead was there to protect honest error from criminal prosecution. Proof that a public servant intended to receive a benefit along with proof that he or she also knew the acts were “unauthorized”
 
 negates
 
 the possibility that the misconduct was the product of inadvertence, incompetence, blunder, neglect or dereliction of duty, or any other act, no matter how egregious, that might more properly be considered in a disciplinary rather than a criminal forum. The statute thus erects high barriers to prevent a criminal court from reviewing mere errors of judgment on the part of public officials.
 

 Here, the prosecution surmounted the high statutory barriers and demonstrated that these defendants were engaged in ultra vires criminal conduct. The evidence supported the conclusion that defendants knew that the unlawful entering and searching of Jackson’s apartment and the detention of its occupants without their consent and without a warrant was an “unauthorized exercise” of police functions. Defendant Feerick had been specifically directed by her commander to seek a warrant. Defendants, however, decided to proceed on their own mission without one. Also, there can be little question that defendant DeVito knew that entering false information on New York City police records was unauthorized.
 

 Although the question of intent to receive a “benefit” is closer, the proof was unassailable that the defendants intended to obtain the return of the lost police radio. Retrieving an object
 
 *449
 
 where its loss could have subjected defendants to scorn, ridicule or possible discipline can be viewed as an advantage or gain. Moreover, the definition of benefit includes any desired gain or advantage to third parties (Penal Law § 10 [17]). Significantly, Feerick’s commanding officer never considered the radio stolen. When asked to clarify the situation, he stated that his “determination was that the radio was lost under circumstances that I didn’t find [to be] misconduct.” Moreover, Lieutenant Feerick was specifically told by her commanding officer not to go to the building to find the lost radio.
 
 [8]
 
 Instead, as her commanding officer explained at trial, “My directions to her were either/or, to give it to the detectives or go to the Narcotics Division for their assistance in getting a warrant.” He gave Feerick these directions because her unit was not responsible for locating property like the missing radio, which was the province of detectives. Feerick disobeyed these directions from a superior officer.
 

 As a result, defendants — although purportedly acting under the authority of the Police Department and while on duty— were not pursuing the radio in furtherance of prescribed law enforcement duties, but rather in violation of orders and
 
 for their own benefit.
 
 The intent behind seeking the return of the radio was not some general, societal benefit in reducing crime, which would not suffice under the statute, but rather to benefit themselves.
 

 We therefore conclude that the evidence was sufficient to support the official misconduct count.
 

 The Jury Charges
 

 Defendants also question the propriety of two jury charges. First, defendants take issue with the court’s charge
 
 *450
 
 relating to the official misconduct counts, which described when a search of an apartment would be lawful. The court did correctly instruct the jury on the well-established exceptions to the warrant requirement: a search would be lawful where there was consent, an emergency or exigent circumstances. However, defendants contend that the court confused constitutional unlawfulness under the Fourth Amendment (for which there are no criminal sanctions) with criminal unlawfulness under the Penal Law
 
 (cf., Brown v State of New York,
 
 89 NY2d 172). This charge was not part of any general instruction to the jury, which could have suggested some independent crime of unlawful search.
 

 The trial court was very clear as to what crimes were being charged, and consistently relayed to the jury that defendants needed to have knowledge that their acts were unlawful. Although it may have been better practice to avoid the word “unlawful” in describing reasonable searches, the charge was in fact necessary for the defense. Without the charge, the jury would have had little foundation for a determination that the defendants had a reasonable basis for believing that they were authorized to enter and search the apartments. In carefully laying out the elements of each count, the court constantly reaffirmed the need for the jury to find that each element must be proven beyond a reasonable doubt. Linked as it was to the “unauthorized exercise of [an] official function” element of the crime of official misconduct (Penal Law § 195.00 [1]), and given the Trial Judge’s carefully drawn instructions as to each element of each crime charged, we discern no meaningful possibility that this charge misled the jury
 
 (People v Maher,
 
 89 NY2d 456, 464;
 
 People v Dimick,
 
 107 NY 13, 26).
 

 Second, with respect to unlawful imprisonment, defendants contend and the People concede that the court improperly instructed that a “stop and frisk” was permitted only in public places. A police officer justifiably present in a private apartment may frisk an occupant under the reasonable belief that his or her safety is in jeopardy. However, the jury verdict reflected that such was not the case here. Having found defendants guilty of trespass, which required a conclusion that defendants “entered or remained
 
 unlawfully
 
 in the dwelling,” the jury necessarily determined defendants were not “justifiably present” in the apartment.
 

 Scope of the
 
 Kastigar
 
 Hearing
 

 We next turn to the question of whether there should have been a de novo*
 
 Kastigar
 
 hearing based on the fact that rele
 
 *451
 
 vant
 
 Rosario
 
 material was not turned over before or during the initial
 
 Kastigar
 
 inquiry. Defendants claim that, under
 
 People v Banch
 
 (80 NY2d 610,
 
 supra),
 
 the People’s failure to turn over six such
 
 Rosario
 
 documents meant that they were entitled to an entirely new
 
 Kastigar
 
 hearing.
 

 Defendants read
 
 Banch
 
 too broadly. In
 
 Banch,
 
 we held that the remedy for a pre-trial
 
 Rosario
 
 violation is not automatic reversal of the conviction but a new hearing, and we remitted the matter to Supreme Court. Defendant Banch had requested a reopening of the pre-trial suppression hearing upon discovery that the witness police officer’s memo book had not been turned over in a timely fashion to enable the defendant to cross-examine the officer’s hearing testimony.
 

 The
 
 Rosario
 
 obligation ensures that a defendant has an opportunity to cross-examine the People’s witnesses effectively. Defendants here received that opportunity at the original pretrial
 
 Kastigar
 
 hearing, and they do not contend otherwise, with the notable exception of the cross-examination of Detective Miller regarding matters addressed in the six documents later determined to be
 
 Rosario
 
 material. It stands to reason that if the contents of the
 
 Rosario
 
 materials do not relate to other witnesses testifying for the People — and here Miller was the People’s only witness — and do not impact any other issue raised at the initial
 
 Kastigar
 
 hearing, there is no credible justification for a de novo hearing. Indeed, in this case, as in
 
 Banch,
 
 all that defendants first requested was a “reopened” hearing.
 

 Although
 
 Banch
 
 states a “new” hearing should be granted, more in line with the underlying rationale of
 
 Rosario
 
 was the Appellate Division’s understanding of “new.” That court required the hearing to be reopened to the extent necessary to explore the contents of the
 
 Rosario
 
 documents, and then required a “new”
 
 Kastigar
 
 ruling. The hearing court, allowing some leeway, permitted some needed background questions, and then limited the cross of Miller to the contents of the six
 
 Rosario
 
 documents. Then, after reviewing the transcript of the first
 
 Kastigar
 
 hearing, the court issued a “new” ruling. We perceive no error in such a procedure.
 

 Significantly, this understanding does no harm to our holding in
 
 Banch.
 
 The relative unavailability of a harmless error analysis for
 
 Rosario
 
 violations remains intact
 
 (see, People v Banch, supra,
 
 80 NY2d, at 615-618;
 
 People v Young,
 
 79 NY2d 365, 369). Although some
 
 Rosario
 
 violations may require or lead to, in defendants’ words, a “full blown” hearing, the hear
 
 *452
 
 ing court here was well within
 
 Banch
 
 and its discretion, to reopen the
 
 Kastigar
 
 inquiry only to the extent necessary to cross-examine the People’s witness as to the contents of the six
 
 Rosario
 
 documents. The assertion that a high-level mystery witness from the Police Department had something relevant to contribute, without more, was insufficient to threaten this conclusion.
 

 The claims of a
 
 Rosario
 
 and
 
 Kastigar
 
 violation at trial, based on documents and facts which were unquestionably known to the defendants at the time, were not raised at trial where the court could have addressed these issues, and they are thus unpreserved for our review
 
 (see, People v Rogelio,
 
 79 NY2d 843, 844;
 
 People v Rivera,
 
 78 NY2d 901, 902;
 
 People v Jackson,
 
 78 NY2d 900, 901). Defendants’ claim that failure to hold a de novo hearing violates due process was not raised below, and is likewise unpreserved. To the extent that defendants complain that the hearing court reached the wrong pre-trial
 
 Kastigar
 
 determination, that claim presents only a mixed question of law and fact. Since evidence appears in the record to support that determination, the court’s conclusions are beyond our further review
 
 (see, People v Hallman,
 
 92 NY2d 840, 842).
 

 Immunity Based on Grand Jury Testimony
 

 Having been convicted of perjury for his false testimony before the Grand Jury regarding Stokes’s drug charge, defendant Rosario claims immunity from prosecution for any charges arising out of the September 26 incidents. Understandably, he does not contest the perjury conviction, which is specifically exempted from the statute
 
 (see,
 
 CPL 50.10 [1]).
 

 In order for there to be immunity, the connection between the “transaction, matter or thing” about which a witness testifies before the Grand Jury and the criminal charges must be “real and of some substantiality, not merely trifling, imaginary or speculative”
 
 (Matter of Gelinas v Barrett,
 
 147 AD2d 293, 295 [Levine, J.] [citations omitted];
 
 see,
 
 CPL 190.40, 50.10 [1];
 
 People v Williams,
 
 81 AD2d 418,
 
 affd on opn below 56
 
 NY2d 916). Rosario, however, did not testify to an actual transaction. He falsely testified that the drugs were obtained when Stokes dropped them in the alley, rather than from the apartment the officers had improperly searched. As a result, there can be no question that the connection between the crimes with which Rosario was charged and the transaction about which he testified was illusory, because that transaction itself was imaginary.
 

 
 *453
 
 Fabricated transactions do not confer immunity under CPL 190.40. To hold otherwise would allow — indeed encourage— witnesses to invent encounters with real people in the hope that the mention of actual objects and real persons will shield them from prosecution. This Court has refused to burden the immunity inquiry with “chance and gamesmanship” as “inconsistent with the ends of justice, [un] warranted by any legitimate interests of the defendant, and * * * [un] intended by the Legislature”
 
 (People v Sobotker,
 
 61 NY2d 44, 49). Allowing Rosario the benefit of his “imaginary transaction” testimony would do precisely that.
 

 In sum, we conclude that the evidence was sufficient to support the official misconduct and unlawful imprisonment convictions; that the jury charges were adequate under the circumstances; that reopening the
 
 Kastigar
 
 hearing rather than granting an entirely new one was proper; that defendants’ trial claims of
 
 Rosario
 
 and
 
 Kastigar
 
 violations are unpreserved; that evidence in the record supports the
 
 Kastigar
 
 determinations, which, being mixed questions of law and fact, are not further reviewable; and finally, that defendant Rosario was not entitled to immunity from prosecution based on his Grand Jury testimony.
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Levine and Wesley concur; Judge Rosenblatt taking no part.
 

 Order affirmed.
 

 [1]
 

 . In order to protect a defendant’s Fifth Amendment rights, a
 
 Kastigar
 
 hearing is held to ensure that statements by police officers, which are compelled under penalty of dismissal, are not used in a criminal investigation or proceeding
 
 (Kastigar v United States,
 
 406 US 441).
 

 [2]
 

 . Actually, there were five documents, plus one that was lost or missing. The court determined that defendants should have the opportunity to question the People’s witness as to the contents of this lost document in addition to the five other documents found to constitute
 
 Rosario
 
 material.
 

 [3]
 

 . For example, Penal Law of 1909 § 1844 (“Delaying to take person arrested for crime before a magistrate”);
 
 id.,
 
 § 1847 (“Misconduct in executing search warrant”);
 
 id.,
 
 § 1875 (“Violation by sheriff of certain provisions relating to prisoners”).
 

 [4]
 

 . The former statute, Penal Law § 854, provided:
 

 “Oppression committed under color of official right.
 

 “A public officer, or a person pretending to be such, who, unlawfully and maliciously, under pretense or color of official authority:
 

 “1. Arrests smother, or detains him against his will; or,
 

 “2. Seizes or levies upon another’s property; or,
 

 
 *446
 
 “3. Dispossesses another of any lands or tenements; or,
 

 “4.
 
 Does any other act, whereby another person is injured in his person, property or rights,
 

 “Commits oppression and is guilty of a misdemeanor.”
 

 In 1945, the word “oppression” replaced the word “extortion” (L 1945, ch 486).
 
 See generally,
 
 Annotation,
 
 What Constitutes Official Oppression,
 
 83 ALR2d 1007.
 

 [5]
 

 . Section 195.00 (2) concerns nonfeasance by public servants, but is not at issue in this case.
 

 [6]
 

 .
 
 See,
 
 Alaska Stat § 11.56.850; Colo Rev Stat Ann § 18-8-404; Del Code Ann, tit 11, § 1211; Ill Ann Stat, ch 720, § 5/33-3; Ind Code Ann § 35-44-1-2; Iowa Code Ann § 721.2; Kan Stat Ann § 21-3902 (a); Ky Rev Stat Ann § 522.020; Mont Code Ann § 45-7-401; Neb Rev Stat § 28-924; NH Stat Ann § 643:1; NJ Stat Ann § 2C:30-2; Ore Rev Stat §§ 162.405,162.415; Tenn Code Ann § 39-16-402; Tex Penal Code Ann § 39.02; Utah Code Ann § 76-8-201; Wash Rev Code Ann § 9A.80.010; Guam Code Ann, tit 9, § 49.40 (a).
 

 [7]
 

 . The New Jersey Supreme Court has abjured the use of “corrupt” in interpreting its parallel official misconduct statute. The essence of official misconduct, according to that court, is not financial dishonesty, but whether the act was done “willfully” and “unlawfully,” that is, in “ ‘bad faith and not honestly’ ”
 
 (State v Schultz,
 
 71 NJ 590, 601, 367 A2d 423, 429). Use of “corrupt” or “corruptly” would be misleading
 
 (id.).
 

 The Model Penal Code’s “official oppression” statute (Model Penal Code § 243.1) requires only that the public official know that his or her acts were illegal. It has rejected such terms as “malicious” or “corrupt” “on the general ground that their content is too vague and on the particular ground in this case that it would be unsound to admit any defense other than the actor’s good-faith belief in the legality of his conduct” (ALI, Model Penal Code and Commentaries § 243.1, at 300 [1980]).
 

 [8]
 

 . “Q. [defense counsel] Inspector, you had a conversation with Lieutenant Feerick on the 25th [of September], correct?
 

 “A. [Feerick’s commanding officer] Yes.
 

 “Q. Lieutenant Feerick, prior to going to Taino Towers [the apartment complex in question], said to you that she wanted to go to Tower 4 and knock on the door and do a consent search; is that correct?
 

 “A. Yes.
 

 “Q. She was the one who mentioned ‘consent search’ right?
 

 “A. I don’t remember ‘consent search,’ but she wanted to go to that apartment.
 

 “Q. Okay. And she wanted to knock on the door and see if anybody was in there, right?
 

 “A. Yes.
 

 “Q. Okay. And you told her, ‘No, don’t do that. Either go to the detectives or get a search warrant for narcotics,’ right?
 

 “A. Correct.”