This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 13
The People &c.,
          Respondent,
     v.
William Flanagan,
          Appellant.

Donna Aldea, for appellant.
Yael V. Levy, for respondent.

DiFIORE, Chief Judge:

Defendant was convicted, upon a jury verdict, of conspiracy in the sixth degree (Penal Law § 105.00) and two counts of official misconduct (Penal Law § 195.00 [1], [2]).  On appeal, defendant primarily challenges his convictions on the

- 1 -

bases of the legal sufficiency of the evidence and the fairness of the trial.  We conclude that these claims lack merit and affirm the order of the Appellate Division in all respects.

I.

On May 19, 2009, shortly before Memorial Day weekend, school authorities reported the larceny of over $3,000 of electronic equipment from a high school (the High School) to the Nassau County Police Department (NCPD).  That same day, an NCPD patrol officer from the Seventh Precinct responded to the High School's complaint and interviewed the principal.  This was one of a string of equipment thefts at the High School that had occurred throughout the 2008-2009 school year, all of which had been reported to the NCPD.  As to this most recent theft, the principal told the officer that the school's surveillance video had captured a student, Z.P., on the High School premises on May 18 after school hours and without permission, and that witnesses had seen Z.P. trying to gain entry to the auditorium where the stolen equipment had been locked inside.

The officer recorded the details of the principal's complaint in a supporting deposition using form PDCN32B.  The supporting deposition, which was sworn to by the principal and signed by both the principal and the officer, plainly stated that the victim wanted the perpetrator to be arrested.  On the back of the supporting deposition, the officer wrote down NCPD case report numbers associated with the prior thefts the High School

had already reported.  In accordance with NCPD protocol, the officer called in her case report so that the information could be entered into the NCPD computer system and then turned in the supporting deposition at the Seventh Precinct.  As the suspect was not present at the scene, the patrol officer could not make an arrest and the felony investigation, upon review, was assigned to the detectives in the Seventh Precinct detective squad (the Squad) for the purpose of conducting further "investigation and [to] move towards making an arrest."

In the meantime, the assistant principal informed both Z.P. and his father, Gary Parker, that Z.P. was being suspended for five days for stealing the equipment and that the school had reported the larceny to the police.  Gary Parker was a long-time benefactor of the NCPD who regularly entertained high-ranking members of the department.  Due to Parker's connections, Z.P. had obtained an internship with the NCPD that spring and, thus, was a department employee at the time the crime was reported.

A detective, who was "catching cases" on May 19 when the Squad received the police report of the larceny through the department's computer system, then created a case jacket, assigned a detective division number to the case, and assigned himself the case.  That same day, however, a lieutenant, who was the commanding officer of the Squad, learned that Z.P. was an NCPD employee and that his father was closely connected with the "upper echelon" in the department, meaning "chiefs and the

commissioners."  The lieutenant placed a call to Internal
Affairs, which directly reported to the Police Commissioner and
handled all cases involving department employees, to refer the
case.  Hours later, she received a call from Deputy Chief of
Patrol John Hunter, who did not work in Internal Affairs but
nonetheless outranked her, informing her that the case would stay
with the Squad.  Her response was "Yes, sir."  Concerned about
the attention this case already appeared to be receiving, the
lieutenant reassigned the case to Detective Bruce Coffey who had
an established relationship with school authorities and who the
lieutenant believed was better at crossing his t's and dotting
his i's.

At the behest of the detective sergeant who usually
supervised Coffey, the lieutenant allowed Detective Sergeant Alan
Sharpe to serve as Coffey's supervisor on this case.  Sharpe, who
was second in command at the Squad, then instructed Coffey to
meet with the principal.  Sharpe replaced the lieutenant and
became the Squad's commanding officer days later on May 27.
Sharpe explained to Coffey that "higher-ups" at the NCPD had been
calling about the case and these "higher-ups" did not want an
arrest.  Sharpe directed Coffey to obtain a statement of
withdrawal from the victim, which would serve to drop the
complaint and close the case.  Coffey followed the order of his
supervisor.  On May 21, Coffey went to the High School where he
met with the principal and spoke with two other school employees

who were witnesses to the crime.  The principal was "adamant" about having Z.P. arrested and Coffey, conflicted as to his supervisor's directives to dispose of the case and the victim's wishes to proceed with it, did not present the principal with the withdrawal form.  Afterwards, Coffey communicated the principal's position to Sharpe and told Sharpe he was unable to obtain the withdrawal.[1]

In advance of the upcoming Memorial Day weekend, Gary Parker also met with the principal.  Parker informed her that Z.P. had confessed to the theft, but implored her to speak to the school district Superintendent about not having Z.P. arrested. The principal emailed Detective Coffey asking the police to place the investigation on hold until she was able to confer with the Superintendent.  Parker also called a friend of Z.P.'s, who had received stolen property from his son, and directed him to deliver this property to the police.  The friend, along with another individual who had received some of the stolen property from Z.P., brought the property to the Fifth Precinct and told the police that it was stolen.  The police obtained statements from these witnesses.  Sharpe sent the detective originally assigned to the case to retrieve this property from the Fifth Precinct.  The detective did so and placed it in the Squad's

---

[1] The withdrawal form is on NCPD letterhead and states in part, "the Detectives have advised me that they are prepared to proceed with this case.  However, I no longer wish to prosecute . . . ."

storage locker without logging it in the Squad's evidence log, contrary to normal protocol.  Parker also sought the assistance of his friend, Deputy Chief of Patrol Hunter.  On that Saturday, Hunter asked a police officer, who had nothing to do with the larceny investigation, but was the principal's nephew, to speak with his aunt about the case.  The officer, after deliberation, informed Hunter that he would not call his aunt.

On the Tuesday after Memorial Day, the principal, the Superintendent, and the attorney for the school district made the decision that, in view of the fact that in excess of $11,000 of equipment had been stolen from the school, the High School would press charges and have Z.P. arrested.  Coffey, aware of the victim's desire to proceed with the case, nonetheless complied with the order of his supervisor, Detective Sergeant Sharpe, and declined to investigate the matter any further or effectuate an arrest.  To this end, Coffey never preserved, obtained, or viewed the surveillance video in the High School's possession.  He also never invoiced, vouchered, or photographed the stolen property in the Squad's possession, as was required by department protocol, and left this evidence of a crime in the Squad's locker instead of securing the evidence in the NCPD Property Bureau.[2]  Although

---

[2] Leaving the evidence unvouchered in the Squad's locker effectively bypassed various police protocols that required notice to the interested parties, including the department.  A signed "Property Bureau Invoice" (PDCN106) form was required to be filed to voucher *any* property, not just evidence of a crime, in the Property Bureau.  Moreover, once the physical items were

Coffey conducted interviews with two school employees on May 21, he did not prepare any written statements of these witnesses or even take notes during the interviews. Coffey's omissions and refusal to act were done with the aim of preventing Z.P.'s arrest. Coffey understood this to be the goal of his supervisor, Sharpe, who made it abundantly clear to Coffey that there would be no arrest in this case and that Coffey was to obtain a withdrawal of prosecution.

On June 16, Sharpe and Hunter made arrangements for the principal and another school employee to meet with a detective who was not involved in Z.P.'s case in order to obtain the stolen property in the Squad's possession. This detective, a 15-year veteran, after speaking with Sharpe, presented the principal with the evidence he found unvouchered in the Squad's locker and asked her to sign two documents. The first was a document acknowledging receipt of the property. The second was a withdrawal of prosecution form. Upon reviewing the documents, the principal told the detective that she would not sign the withdrawal and that she did not have authority to drop the charges. Upon learning that the High School did not want to drop the case, the detective told the principal that he would need to bring the property back to the precinct and she would have to follow up with the detective assigned to the case. Then, the

in the custody of the Property Bureau, a "Property Disposition Card" (PDCN83) and a "Notice to Claimant Card" (PDCN110) "must accompany ALL property which is to be destroyed or returned."

detective stepped out of the room to call Sharpe, who had directed him to obtain signatures on both forms, and informed Sharpe that the High School had refused to abandon their complaint.  Sharpe ordered the detective to bring the property back to the precinct.  The detective complied.

Two days later, Gary Parker encountered defendant William Flanagan at the U.S. Open.  Parker and defendant knew each other well and had socialized on many occasions in the past. At this time, defendant was the detective sergeant in charge of Asset Forfeiture.  On or about July 14, however, defendant was appointed by the Police Commissioner to Second Deputy Commissioner for Special Projects, one of the highest ranks in the NCPD.  Parker explained the situation with his son and enlisted defendant's help in achieving a favorable resolution, which Parker admitted was no prosecution or arrest of his son. Defendant told Parker that he would look into the matter and see what he could do.

A few days later, Parker followed up with defendant by email.  Parker asked if defendant needed any further information from him, to which defendant responded "I have all I need" and noted that he had "already put a couple of pieces in motion." Phone records revealed that defendant then immediately called the Seventh Precinct and had a ten minute phone conversation with someone there.  The following Monday, defendant received an email from Sharpe stating that Sharpe was still waiting for a call back

from the High School regarding the return of property the two of them had discussed the previous week. Defendant responded, "[t]hanks, talk to you soon."

Over the course of the summer, Coffey was pressured by Sharpe to return the stolen property and obtain a withdrawal of prosecution from the High School. Failed attempts to arrange the return of the stolen property were reflected in a series of emails. Parker emailed defendant throughout the summer seeking updates and expressing concern with how the case would be resolved. Defendant responded to one such email with "I have no doubt about the resolution." Additionally, the principal expressed frustration with how the department was handling the case. In one email she remarked, "I assume that [Z.P.] has not been arrested, since it is clear that the police want to bury this case."

At the end of the summer, Coffey made arrangements to meet with the principal and another school employee on September 1 to return the stolen property. At this meeting, the principal was again presented with the property and the same two documents brought by another detective to the June 16 meeting, the property receipt and withdrawal of prosecution form. Both the principal and the other employee signed the receipt, but the principal expressed outrage at being presented with the withdrawal and told Coffey that the High School was not dropping the charges. Coffey left the evidence with the principal and returned to the precinct

with the unsigned withdrawal.

About one week later, Coffey received an email from Sharpe which read, "I NOTICED THE LAPTOPS AND PROJECTOR GONE FROM PROPERTY LOCKER.  WERE THEY RETURNED TO THE SCHOOL DISTRICT DUE TO THEM ELECTING NPA?"[3]  Coffey later informed Sharpe that the property had been returned, but that the principal had refused to sign the withdrawal.  Despite Sharpe's directive to Coffey to keep trying to get the principal to sign the withdrawal, Coffey did not comply and had no further interaction with anyone at the High School after the September 1 return.

Around this same time, Parker emailed defendant to inquire about whether the property had been returned.  Defendant indicated that it had.  Parker responded with "THANK YOU!!!!!!" to which defendant replied, "[d]e nada family."  Within days of this exchange, Parker's wife sent defendant gift cards.  In response to Parker's email inquiry about defendant's receipt of the gift cards, defendant said they were "[o]ver the top."

Later in the fall, both defendant and Coffey were at a police retirement party.  While Coffey was sitting at a table with other members of the Squad, defendant approached Coffey, shook his hand, and said, "[t]hank you."  Coffey responded, "[t]hank you.  You're welcome."  Defendant did not shake hands with anyone else at the table and Coffey understood that defendant had thanked him for his involvement with Z.P.'s case.

---

[3] Coffey testified that "NPA" stood for "no police action."

One year later, in September 2010, Coffey was preparing to retire.  Aside from his initial meeting at the High School on May 21, 2009, Coffey had purposefully done no investigation on this case, had not followed-up on any leads, and had not arrested Z.P.  Nonetheless, Coffey had left the case marked open in the department's computer system.  Prior to his departure from the department, Coffey prepared a false report to close out the case.  Specifically, Coffey falsely represented that the principal did not want to move forward with the case and was no longer in need of police assistance.  Sharpe, as Coffey's case supervisor, had to review and sign off on this statement.  Sharpe instructed Coffey to indicate that the principal "[did] not want to see [Z.P.] arrested."  Coffey complied with this directive, though he knew that this statement was false.  On September 19, 2010, the case was officially closed.

## II.

In March 2011, a newspaper published an article about the thefts at the High School, which resulted in the Nassau County District Attorney launching an investigation into the handling of Z.P.'s case.  Within days of the article, Gary Parker sent an email to defendant explaining that he was going to distance himself from the NCPD for a time and stating that he hoped defendant would "understand" and "support" his decision to do so.  Defendant conveyed his support and replied, "[l]uv you dude.:) Remember what I told you, 'you're family'.  We take care

of our own."  Parker responded, "[t]hanks. A little separation
. . . ."

As relevant to this appeal, after a seven-and-a-half-month grand jury proceeding, defendant was indicted, along with Deputy Chief of Patrol Hunter and Detective Sergeant Sharpe, for conspiracy in the sixth degree and two counts of official misconduct.[4]  As to the crime of conspiracy, the indictment alleged that on or about and between May 19, 2009 and September 19, 2010[5] these individuals

> "with the intent to engage in conduct that
> constituted the crime of Official Misconduct,
> agreed with one or more persons, including
> the father of a target of a felony
> investigation . . . to return recovered
> stolen property to a cooperative complainant
> in an open felony investigation in an effort
> to justify and ensure the non-arrest of the
> target whose arrest would have otherwise been
> warranted, in order to benefit the target's
> father, a financial and personal benefactor
> of members of the Nassau County Police
> Department."

As to official misconduct, the indictment alleged that, on or about and between June 18, 2009 and September 10, 2009,[6]

---

[4] Defendant was also indicted for receiving reward for official misconduct in the second degree.  He was acquitted of this charge at trial.

[5] These dates correspond with the day the High School reported the theft to the NCPD and the day Coffey and Sharpe filed the false report to close out the case.

[6] These dates correspond with the day defendant first spoke with Gary Parker about Z.P.'s case at the U.S. Open and the day Parker's wife mailed two gift cards to defendant.

defendant committed official misconduct under a theory of malfeasance by ordering subordinates to return stolen property that had been recovered by the NCPD in an open criminal investigation in an effort to justify the non-arrest of Z.P., whose arrest would have otherwise been warranted.  The indictment further alleged that on or about and between June 18, 2009 and September 11, 2009[7] defendant committed official misconduct under a theory of nonfeasance by ensuring that Z.P. would not be arrested despite the fact that there was probable cause to arrest him and a willing complainant, in violation of defendant's inherent duties as an officer as well as of NCPD policy.

Prior to trial, defendant, pursuant to CPL 210.35 (5), moved to dismiss the indictment on the ground that the integrity of the grand jury proceedings had been impaired.  The trial court denied this motion, concluding that the exceptional remedy of dismissal was not warranted.  Defendant then proceeded to trial. Defendant's indicted coconspirators, Hunter and Sharpe, who pleaded guilty, did not testify at defendant's trial.  The unindicted coconspirators -- Coffey, who had entered into a cooperation agreement with the District Attorney, and Gary Parker -- both testified.  Defendant did not testify.  Defendant was convicted of the conspiracy count as well as both official misconduct counts.

---

[7] On September 11, defendant confirmed his receipt of the two gift cards.

Prior to sentencing, defendant moved to set aside the verdict on the grounds that the People had not presented legally sufficient evidence and that defendant was denied his right to a fair trial. The trial court denied this motion, concluding that, viewing the evidence in the light most favorable to the People, legally sufficient evidence was presented and that the record as a whole did not establish that defendant was denied a fair trial. Defendant was sentenced to a sixty-day prison term for conspiracy to be served concurrently with a five-month term for the two official misconduct convictions (three months of which could be satisfied with community service). He was also required to pay a $1,000 fine. The execution of judgment was stayed pending the resolution of defendant's appeal.

On appeal, the Appellate Division affirmed defendant's convictions (132 AD3d 693 [2d Dept 2015]). The Appellate Division held that the evidence was legally sufficient to support the convictions. The court further held that defendant's denial of a fair trial claims were either unpreserved, abandoned, or lacked merit. Moreover, the Appellate Division concluded that any error in this regard was harmless. Defendant's claim that the grand jury process was defective was found to be without merit.

A Judge of this Court granted defendant leave to appeal (26 NY3d 1039 [2015]). We now affirm.

III.

"The standard for reviewing the legal sufficiency of evidence in a criminal case is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (People v Contes, 60 NY2d 620, 621 [1983] [internal quotation marks and citation omitted]). Here, when viewed in this light, the evidence is sufficient to establish the elements of the crimes of official misconduct under both theories as well as of conspiracy in the sixth degree.

Official misconduct is codified in Penal Law § 195.00. Subsection one of the statute pertains to official misconduct by way of malfeasance and subsection two pertains to nonfeasance. In enacting the statute, the legislature "replaced more than 30 prior crimes, all of which dealt with specific malfeasance and nonfeasance in the accomplishment of official duties" (People v Feerick, 93 NY2d 433, 445 [1999]).

Penal Law § 195.00 contains two *mens rea* elements, requiring both an *intent* to obtain a benefit or deprive another of a benefit[8] and *knowingly* acting or refraining from acting (see Feerick, 93 NY2d at 446). The double *mens rea* prevents the criminalization of official actions, or lack thereof, due to

---

[8] A "benefit" is defined as "any gain or advantage to the beneficiary and includes any gain or advantage to a third person pursuant to the desire or consent of the beneficiary" (Penal Law § 10.00 [17]).

"mere errors of judgment" (id. at 448).  This exacting standard

is in keeping with the legislature's goal of criminalizing

"flagrant and intentional abuse of authority by those empowered

to enforce the law," rather than "good faith but honest errors in

fulfilling one's official duties" (id. at 445).  Importantly, the

two *mens rea* requirements were "not [meant] to limit in any

substantive way the types of conduct that would be culpable" (see

id. at 448).  Moreover,

> "[p]roof that a public servant *intended* to
> receive a benefit along with proof that he or
> she also *knew* the acts were 'unauthorized'
> *negates* the possibility that the misconduct
> was the product of inadvertence,
> incompetence, blunder, neglect or dereliction
> of duty, or any other act, no matter how
> egregious, that might more properly be
> considered in a disciplinary rather than a
> criminal forum"

(id. [referencing commentary of the commission that drafted the

current official misconduct statute][additional emphasis added]).

### A.   Official Misconduct for Malfeasance

In order to be guilty of official misconduct for

malfeasance a defendant (1) must commit an act that constitutes

an unauthorized exercise of his or her official functions, (2)

knowing that the act is unauthorized, (3) with the intent to

obtain a benefit or deprive another of a benefit (Penal Law §

195.00 [1]).  Here, defendant -- eschewing the intrinsic purpose

of his own department's protocols and Penal Law § 450.10 --

argues that he did not commit an act that was an *unauthorized*

exercise of his official functions because the police have the

unfettered authority to return stolen property in their possession to its rightful owner.  The People counter that the return of the stolen property in this case was an unauthorized exercise of defendant's official functions because it violated departmental protocol and state law (Penal Law § 450.10) governing the return of evidence in a pending criminal investigation or matter and was done for the singular corrupt purpose of averting Z.P.'s arrest.

We disagree with defendant's assertion that he cannot be guilty of malfeasance because the return of stolen property to its owner is an act that is inherently authorized.  However, we also disagree with the People's assertion that the act of returning the stolen property to the High School was unauthorized on the sole basis that it was prompted by a corrupt motive or purpose.  Instead, we clarify that the same act may be authorized in some cases, but unauthorized in others, based on a consideration of all the surrounding circumstances.  Evidence of these circumstances may include, among other things, the manner in which the act was undertaken, the governing guidelines, rules, and protocols, as well as the actor's motive.

For example, in People v Feerick (93 NY2d 433 [1999]), police officers sought to recover a missing police radio -- something they indeed had the authority to do.  However, because the officers recovered the radio by entering and searching an apartment and detaining the occupants, all without the occupants'

consent and without a warrant that the officers had been directed to obtain, we concluded that their actions constituted an unauthorized exercise of their official functions (id. at 448). We held that "defendants -- although purportedly acting under the authority of the Police Department and while on duty -- were not pursuing the radio in furtherance of prescribed law enforcement duties, but rather in violation of orders and *for their own benefit*" (id. at 449).

Here, the evidence is sufficient to establish that defendant, along with his accomplices, used his position of power to orchestrate the return of unvouchered evidence to the school authorities with the goal of terminating the open felony investigation of his friend Gary Parker's son and preventing the son's imminent arrest. Defendant became involved in the return effort at Parker's behest a mere two days after a veteran detective, who was not part of the conspiracy, refused to leave the unvouchered evidence with the victim after the principal made clear she was not withdrawing the criminal allegations in this open felony investigation. Defendant communicated with both Parker and the Squad's then-commanding officer, Sharpe, and Sharpe continued to issue directives to Coffey. Coffey testified that he knew that as part of his official duties he was supposed to investigate the felony larceny, knew he had ample basis to arrest Z.P., and knew he was responsible for vouchering the stolen property as well as securing the surveillance video of the

crime.  Coffey admittedly evaded these duties because his supervising officer, who was acting in furtherance of the conspiracy, made clear that there would be no arrest or prosecution in this case.

Coffey's understanding of NCPD procedures with respect to handling evidence in an open felony investigation was corroborated by the testimony of two other detectives on the Squad as well as by that of the lieutenant who preceded Sharpe in the command of the Squad.  Both detectives explained that whenever the police obtain property a PDCN106 (also known as a voucher) must be filled out and the property along with the voucher must be delivered to the custody of the Property Bureau. One of the detectives also testified that notice of the return of property, which constitutes evidence in an open case, must be given to the District Attorney.  Further, he testified that a DD89 ("District Attorney's release form for property") must be filled out and signed by the District Attorney before this property is returned. To this point, the lieutenant testified that there is an "onus on the police to preserve evidence so that if we go forward in a case it's available to be reviewed in that case."  Moreover, she testified that before returning property in an open case there are set procedures, which include taking photographs of the property[9] and reaching out to the District

---

[9] Although the record contains two Polaroid photographs, Coffey, who was the investigating detective and responsible for the evidence, testified that he did not take these photographs

Attorney, that must be followed.

Preservation of evidence, which is the very goal of Penal Law § 450.10, is undertaken to maintain the evidence's integrity for the prosecution of the case while affording due process to the defendant by providing his attorney with the opportunity to review the evidence before its return to the victim. In this case, the District Attorney was kept in the dark about the existence of the felony investigation. Additionally, Z.P.'s attorney, who was involved in negotiations with the High School, was never contacted by the police. Defendant's accomplices did not comply with the notice and other requirements of the statute or department protocols. Thus, the trial testimony is sufficient to establish that the return of the evidence of the crime -- under these specific circumstances, where the applicable statute and department protocols were not followed -- was not an authorized exercise of official functions, that defendant knew that the official actions taken were unauthorized, and that these actions were undertaken with the intent to obtain a benefit.

Defendant's argument to the contrary ignores the fact that, by the design of defendant and his accomplices, the return

---

and did not know their source. Indeed, Coffey found the photographs in the box containing the unvouchered evidence that was stored in the Squad's locker. It does not appear that these photographs were taken in accordance with NCPD policy on vouchering evidence.

of evidence to the victim in this open felony case was done to avoid the procedural triggers designed to alert other members of law enforcement with official interests in the safekeeping of evidence to the unauthorized acts of the coconspirators. As in Feerick, it is defendant's knowing participation in a "purportedly" authorized official action, which was actually done in blatant violation of department protocols and state law, coupled with the intent to thwart arrest and prosecution of a suspect, all to the benefit of the suspect's father, that permitted the jury to rationally conclude there was legally sufficient evidence to convict defendant of official misconduct under a theory of malfeasance.

### B. Official Misconduct for Nonfeasance

Turning to official misconduct for nonfeasance, to be guilty of this crime a defendant (1) must knowingly refrain from performing a duty imposed by law or clearly inherent in the nature of his or her office (2) with the intent to obtain a benefit or deprive another of a benefit (Penal Law § 195.00 [2]). Defendant argues that this Court should adopt a bright-line rule that nonfeasance cannot lie where a public servant has failed to perform a discretionary -- as opposed to a mandatory -- duty. Conversely, the People argue that defendant, along with his police accomplices, had a mandatory duty inherent in the nature of their office to follow the normal path of investigation of a sworn complaint of a felony from a cooperative victim and make an

arrest when there was ample probable cause to believe Z.P. committed the larceny.

Many of the duties imposed on the vast category of public servants covered by the statute are imbued with some degree of discretion.  There is nothing in the plain language of the statute that suggests the word "duty" is only meant to encompass mandatory duties in which there is absolutely no room for the exercise of discretion.  Indeed, Black's Law Dictionary has separate entries for "duty" and "discretionary duty," intimating that a discretionary duty is but one type of duty (compare Black's Law Dictionary [10th ed 2014], duty with id., discretionary duty).  Instead, the plain language of the statute demonstrates that it is not the mandatory or discretionary nature of the failure to act that satisfies the duty element of nonfeasance, but rather the causal connection of the failure to a "flagrant and intentional abuse of authority by those empowered to enforce the law" that does (Feerick, 93 NY2d at 445). Therefore, "[w]e reject this narrow interpretation of the statute and, in accordance with the statutory mandate with respect to interpretation . . . [we] hold that the crime of official misconduct may occur even where the public official's duty is couched with discretion" (People v Mackell, 47 AD2d 209, 217 [2d Dept 1975], affd 40 NY2d 59 [1976]).

Certainly, a public servant's knowing refusal to perform a mandatory action coupled with an intent to obtain a

benefit constitutes nonfeasance.  However, when a public servant, with the intent to obtain a benefit, knowingly refuses to perform a discretionary duty, the performance of which is so obviously fundamental to accomplishing the goals of the public servant's office, that refusal cannot legitimately be understood to be an exercise of discretion; rather, it constitutes an abuse of discretion, which equates to nonfeasance.  In such a situation, the public servant has, in essence, abdicated his or her sworn duty.

Defendant's contention -- that because police officers have a measure of discretion in performing their sworn duties to arrest and investigate, as a matter of law he cannot be said to have knowingly refrained from performing these duties -- completely undermines a statute intended to criminalize public corruption.  We readily acknowledge that the scope of a police officer's duties at the arrest and investigation stages involves the exercise of reasonable discretion.  Here, however, Coffey admitted he did not exercise his discretion in failing to investigate the case and arrest Z.P.  Instead, he complied with the unsavory directives of his accomplice supervisors, following the orders of those of a higher rank in his department, and knowingly failed to perform his duties.  Coffey knew that a felony had been committed at the High School by a suspect identified by the victim, but he did not take written statements from known witnesses, view or obtain a copy of the surveillance

video that showed the suspect entering and leaving the building, voucher the evidence, or follow up on the investigation, despite having a cooperative complainant.  In a conspiracy, the actions of a coconspirator, like Coffey, are attributable to the other conspirators (see People v Caban, 5 NY3d 143, 148 [2005]; People v Salko, 47 NY2d 230, 237 [1979]).  Similarly, because defendant was charged as both a principal and an accomplice, he is criminally liable for the conduct of any other person if he acted with the mental culpability required for committing the underlying offense and solicited, requested, commanded, importuned or intentionally aided that person to engage in conduct constituting the offense (see Penal Law § 20.00).  The officers here had no valid reason not to move forward with the investigation, and defendant, as an accomplice with a shared intent, can be held criminally responsible for the purposeful inertia of his accomplices.

Pivotally, the evidence was sufficient to establish that the termination of Z.P.'s case -- which before defendant's accomplices got involved had been moving along in the normal investigative process toward arrest and prosecution -- could not be attributed to any legitimate reason, such as an uncooperative victim, a lack of evidence, or the District Attorney's decision not to prosecute the case.  Contrary to defendant's claim, this was not a failure of an officer to perform a discretionary duty, but a disavowal of a sworn duty by a public official, as

defendant and his accomplices sought to avoid the inexorable result that performance of such duty would have produced. Thus, the evidence was sufficient to prove that defendant committed the crime of official misconduct by nonfeasance when he directed his accomplice officers to refrain from performing their fundamental duty to investigate a crime, a duty inherent in the nature of their office.

We also reject defendant's contention that the officers here did not "refrain[] from performing [] dut[ies]" as this phrase is understood in Penal Law § 195.00 (2) because the adoption of such a holding would upset the balance in the criminal justice system that exists between the duty of the police officer and that of the District Attorney (NY Const, art XIII, § 13; County Law § 700; see generally Matter of Johnson v Pataki, 91 NY2d 214 [1997]). The constitutional and statutory authority to arrest has reasonable and necessary parameters and does not bestow unfettered discretion on the police to purposely stop the investigation of a legitimate felony complaint in an attempt to prevent the prosecution of a known suspect in order to obtain a benefit for the suspect's father.

Thus, in sum, we hold that on this record the jury could have rationally concluded that the elements of official misconduct by nonfeasance were established by proof that defendant, acting alone and with others, in his supervisory capacity, caused the abdication of the inherent duty to

investigate a felony complaint in order to prevent the arrest and prosecution of Z.P., where there was overwhelming evidence of the crime, all to the benefit of the suspect's father.

### C.  Conspiracy in the Sixth Degree

Defendant's next contention -- that there was legally insufficient evidence to support his conspiracy conviction -- is similarly unavailing.  To be guilty of conspiracy in the sixth degree, a defendant (1) must "with intent that conduct constituting a *crime* be performed" (2) "agree[] with one or more persons to engage in or cause the performance of such conduct" (Penal Law § 105.00 [emphasis added]).

> "The crime of conspiracy is an offense separate from the crime that is the object of the conspiracy.  Once an illicit agreement is shown, the overt act of any conspirator may be attributed to other conspirators to establish the offense of conspiracy and that act may be the object crime.  But the overt act itself is not the crime in a conspiracy prosecution; it is merely an element of the crime that has as its basis the agreement. It is not offensive to permit a conviction of conspiracy to stand on the overt act committed by another, for the act merely provides corroboration of the existence of the agreement and indicates that the agreement has reached a point where it poses a sufficient threat to society to impose sanctions"

(People v McGee, 49 NY2d 48, 57-58 [1979] [internal citations omitted]).

As we have already concluded that the evidence, when viewed in the light most favorable to the People, was sufficient to prove the crime of official misconduct beyond a reasonable

doubt, the first element of conspiracy has been satisfied. We further conclude that the second element of conspiracy has been satisfied as there was sufficient evidence of the coconspirators' agreement to commit the crime of official misconduct in this case. The existence of a conspiracy was supported by the trial testimony of the coconspirators, by defendant's admissions in his emails with Sharpe and Parker, and by abundant circumstantial evidence, which, when viewed in the light most favorable to the People, support the jury's finding. As we have long observed, "[i]n prosecutions for the crime of conspiracy the People's case must usually rest upon circumstantial evidence. Defendants, with the education, training and experience of the defendants in this case, do not conduct criminal conspiracies by making written records of their acts" (People v Seely, 253 NY 330, 339 [1930]).

IV.

Lastly, defendant claims that he was denied his right to a fair trial because the trial court improperly admitted into evidence, pursuant to the coconspirator exception to the hearsay rule, coconspirator hearsay statements made in furtherance of the conspiracy but prior to defendant joining the conspiracy and after defendant's active participation in the conspiracy ceased. This is an issue of first impression in our Court. We now hold that when a conspirator subsequently joins an ongoing conspiracy, any previous statements made by his or her coconspirators in furtherance of the conspiracy are admissible against the

conspirator pursuant to the coconspirator exception to the
hearsay rule.  This holding is in line with precedent of the
Supreme Court of the United States, as well as with the vast
majority of federal circuit courts, which have held, pursuant to
the Federal Rules of Evidence, that "previous statements made by
co-conspirators are admissible against a defendant who
subsequently joins the conspiracy" (United States v Brown, 943
F2d 1246, 1255 [10th Cir 1991] [observing that First, Second,
Third, Fourth, Fifth, Seventh, Eighth, Ninth, and Eleventh
Circuits have all adopted this "prevailing view"]; see United
States v United States Gypsum Co., 333 US 364, 393 [1948]
[holding the same prior to the adoption of the Federal Rules of
Evidence]).  We agree with the rationale for this rule expressed
by the Second Circuit in United States v Badalamenti (794 F2d 821
[2d Cir 1986]): "a new recruit can be thought to have joined [the
conspiracy] with an implied adoption of what had gone on before
to enhance the enterprise of which he is taking advantage" (id.
at 828 [internal quotation marks omitted]).  Here, that is
certainly the case where defendant, a high ranking officer in the
NCPD, joined the conspiracy after a discussion with coconspirator
Parker in which Parker informed defendant of what had transpired
and enlisted his help to prevent the criminal case from
proceeding against Z.P.

We further conclude, in line with federal case law,
that statements made after a conspirator's alleged active

involvement in the conspiracy has ceased, but the conspiracy continues, are admissible unless this conspirator has unequivocally communicated his or her withdrawal from the conspiracy to the coconspirators (see United States v Brown, 332 F3d 363, 373-374 [6th Cir 2003] ["The defendant carries the burden of proving withdrawal, and must show that he took affirmative action to defeat or disavow the purpose of the conspiracy. Without such action, liability continues for all actions in furtherance of the conspiracy by other conspirators" [internal quotation marks and citation omitted]]; see also United States v Moore, 651 F3d 30, 90 [DC Cir 2011] [concluding the defendant bears burden of proving withdrawal in line with holdings of the Second, Fifth, Sixth, Tenth, and Eleventh Circuits]). Here, defendant makes no argument that such a communication was made. Therefore, we conclude that the trial court made no error in admitting any of the coconspirator statements.

We hold that defendant's remaining contentions lack merit.

Accordingly, the order of the Appellate Division should be affirmed.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order affirmed. Opinion by Chief Judge DiFiore. Judges Rivera, Abdus-Salaam, Stein, Fahey and Garcia concur. Judge Wilson took no part.

Decided February 9, 2017